**Leslie A. SNYDER and Laurel A. Snyder, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 20545.**

United States Court of Appeals, Eighth Circuit.

Oct. 4, 1971.

William R. Mills, Bismarck, N. D., Moody M. Farhart, Farhart, Rasmuson & Olson, Minot, N. D., for appellants.

Harold O. Bullis, U. S. Atty., Fargo, N. D., for appellee.

Before GIBSON and ROSS, Circuit Judges, and EISELE, District Judge.*

GIBSON, Circuit Judge.

Defendants, Leslie A. Snyder and his brother Laurel A. Snyder, appeal a judgment of conviction entered in a jury trial in the District Court of the District of North Dakota, on a four count indictment charging the Snyders with having aided, abetted, counseled and induced (a violation of 18 U.S.C. § 2) Gary F. McDaniel, president of the First Western State Bank of Minot, North Dakota (First Western) in embezzling and misapplying the funds of that bank in violation of 18 U.S.C. § 656 and in making a false book entry in violation of 18 U.S.C. § 1005. The Snyders were tried jointly with McDaniel, who was also convicted but appeals his conviction separately.

In the early part of 1969, the defendants, along with four other persons, had prepared articles of incorporation for Dandy Dan Enterprises and authorized a bank account to be opened at First Western State Bank without depositing any funds in the bank. They never completed the incorporation and the further business of the group was carried on as a partnership, Dandy Dan Enterprises (Dandy Dan). Gary McDaniel acted as their advisor in these matters but neither had an interest in the business nor received any financial benefits from its operations. The six persons were all wage earners, of modest resources, and with little or no prior experience in business.

During the month of March 1969, the partnership investigated several nightclubs in the Minot area for possible purchase. They agreed to purchase the Ranger Bar in Minot for a price of $55,000 less a 10 per cent discount for cash, plus the value of the inventory when they took possession. At the outset it was agreed that each partner was to provide $3,000 from personal resources or by personal borrowing and the rest of the purchase price was to be financed by a partnership note secured by the business. A $5,000 cashier's check for an earnest money deposit was made and it was this check that was the subject of the first count of the indictment. The bank was not paid for this check but there was testimony that the partners had signed a note in this amount as consideration for the check, and a note in this amount signed by each of the partners but having no due date or specified rate of interest was found in the desk of McDaniel's secretary. The members of the partnership testified that the note had been prepared on April 4, at the time the check had been issued, but that because some of the partners were not present when the note was prepared, it was signed on that date only by Laurel Snyder, and another partner, Lyle Snyder, also a brother of

* United States District Judge for the Eastern District of Arkansas, sitting by designation.

the defendants. The rest of the partners signed it individually between the 4th and the 15th of April. Leslie Snyder did not sign the note until the 15th.

In anticipation of an audit by the state bank examiners this item along with other undesirable assets, was covered with fictitious notes allegedly signed by two long-time customers of the bank, one for $75,000 in the name of Alfred Pietsch and another for $72,800 in the name of Leonard Pietsch and his wife, Thelma. All three makers deny having signed these notes but each admitted to having signed one or more blank notes for the bank. In the past transactions subject to criticism were covered in a similar fashion and the notes were sold to another bank just prior to the audit. After the audit the notes were repurchased. There was testimony by the bank officials in which they referred to this process as "tidying up" for the audit.

On May 5 a second cashier's check was issued in the Ranger Bar transaction. It was payable to James Morey in the amount of $3,683.15 and was for the liquor inventory. The third check was issued on May 7 in the amount of $47,954.05, payable to Signal Realty Co., as the final payment on the purchase price of the bar. The bank received no payment for the checks at the time they were drawn, but there was a note, allegedly signed by Leonard Pietsch, which was drawn to cover this amount. Pietsch denied signing this note. These checks were the basis for the second and third counts of the indictment.

The fourth count of the indictment involved an entry on the bank records, dated May 9, 1968, reflecting that $51,637.20 was on deposit in the First National Bank of Minneapolis to the credit of First Western. This entry was admittedly erroneous and was allegedly made under the direction of McDaniel.

Defendants present five questions for review on this appeal, but we need only consider one, whether the evidence is sufficient to support the verdict.

The Supreme Court, in Nye & Niessen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949), pointed out:

"In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his actions to make it succeed.' L. Hand, J., in United States v. Peoni, 100 F.2d 401, 402 (2 Cir.)."

We said in Johnson v. United States, 195 F.2d 673, 675 (8th Cir. 1952):

"Generally speaking, to find one guilty as a principal on the ground that he was an aider and abetter, it must be proven that he shared in the criminal intent of the principal and there must be a community of unlawful purpose at the time the act is committed. As the term 'aiding and abetting' implies, it assumes some participation in the criminal act in furtherance of the common design, either before or at the time the criminal act is committed. It implies some conduct of an affirmative nature and mere negative acquiescence is not sufficient."

By far the most important element is the sharing of the criminal intent of the principal, and this is concededly difficult to prove; nevertheless the Government must prove this sharing of criminal intent. Johnson v. United States, supra; Mack v. United States, 326 F.2d 481, (8th Cir.) cert. denied, 377 U.S. 947, 84 S.Ct. 1355, 12 L.Ed.2d 309 (1964).

Mere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt, Ramirez v. United States, 363 F.2d 33, 34, (9th Cir. 1966); United States v. Joiner, 429 F.2d 489, 493 (5th Cir. 1970); nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting. Ramirez v. United States, supra; United States v. Garguilo, 310 F.2d 249, 253 (2d Cir. 1962).

Mere presence at scene of crime is not evidence of guilt. Hicks v. United States, 150 U.S. 442, 447, 448, 14 S.Ct. 144, 37 L.Ed. 1137 (1893).

The evidence introduced by the Government on the issue of the defendants' intent does not meet the above standard. Viewing the evidence in the light most favorable to the verdict, it is apparent that there is no direct evidence that the Snyders had the requisite knowledge and intent to defraud the bank and the circumstantial evidence here is not sufficient to support a conviction. The Snyders had previously worked for McDaniel and the bank, had taken trips paid for, at least in part, by McDaniel to Mexico and Nevada in the company of about ten other persons, and were frequent visitors to McDaniel's office at the bank, but they took no part in the banking manipulations. McDaniel personally issued the cashier's checks involved in the Ranger Bar transaction, and actively encouraged the business venture. The Snyders operated under McDaniel's guidance and there is no probative evidence that they did not intend to repay any advances made by the bank under McDaniel's guidance.

The most persuasive circumstance that points toward guilt is the lack of any notes or security agreements from the Snyders, except for the $5,000 note to which the Government attaches little significance.[1] The record makes clear that the business of this bank was not carried on in an orderly fashion, and that unlawful book entries were made. The bank's transactions were most informal. One example of this is the practice of allowing customers to write overdrafts. The bank would pay these and treat them as a loan; the drawer would come in later to sign a note. There was evidence that the bank's income from this amounted to $20,000.00 to $30,000.00 per year. Also at the time of these transactions the local situation in Minot had been disrupted by a flood, and a great number of people, including the defendants and bank personnel were involved in flood relief work. Under these circumstances it might not seem at all unusual for the defendants to leave all of the formalities and details to McDaniel. It must be remembered that the defendants were inexperienced in business matters and were almost totally dependent on McDaniel for advice. Their conduct might be viewed as naive and perhaps reckless but it does not appear to be criminal.

We find Logsdon v. United States, 253 F.2d 12 (6th Cir. 1958) relied on by the Government, as not applicable to the factual context of this appeal. Here there is no evidence that the Snyders either knew or must have known that the bank's funds were being embezzled and that they were receiving the proceeds. There is no evidence either direct or circumstantial that would justify such a conclusion.

Under the Government's theory of the case, if the Snyders are not guilty on the first three counts, they cannot be accountable for the false entries in the bank's records; thus as to this fourth count we also must find an insufficiency of evidence.

The judgment of conviction of both Leslie A. Snyder and Laurel A. Snyder is reversed.

---

1. The Government views this note as incomplete because it was dated on the 15th of April, had no due date and no specific rate of interest. We are unable to see what relevance this has to the validity of that note. The note still created an enforceable obligation. Its incompleteness is covered by N.D.Cent.Code § 41–03–15 (U.C.C. § 3–115) dealing with incomplete instruments, which are still complete in all material parts, as was this note. The fact that this note was not on the books of the bank does not bear on the issue of the Snyders' guilt unless the Government can show that they knew or intended that it would not be collected. If that were in fact the case they probably would not have signed the note at all.