UNITED STATES of America, Appellee,

v.

Loren Michael GREY BEAR, Tayron
Dale Dunn, a/k/a Terry Dunn, Leon-
ard George Fox and John Emmanuel
Perez, a/k/a John Perez, Appellants.

UNITED STATES of America, Appellee,

v.

Jesse Dean CAVANAUGH, Paul Henry
Cavanaugh, Maynard James Dunn,
Timothy Sylvester Longie, Jr., Roger
Darrel Charboneau, Dwayne Allen
Charboneau, Richard John LaFuente,
a/k/a Ricky LaFuente, Appellants.

Nos. 86–5264, 86–5265.

United States Court of Appeals,
Eighth Circuit.

Submitted June 8, 1987.

Decided Sept. 14, 1987.

Thomas L. Zimney, Grand Forks, N.D., for Cavanaugh.

Allen J. Flaten, Grand Forks, N.D., for Longie.

Allen J. Larivee, Grand Forks, N.D., for Charboneau.

David Thompson, Fargo, N.D., for Grey Bear.

Dennis D. Fisher and Lynn E. Crooks, Asst. U.S. Attys., Fargo, N.D., for appellee.

Bruce E. Bohlman, Grand Forks, N.D., for LaFuente.

M. Daniel Vogel, Fargo, N.D., for Dunn.

Before LAY, Chief Judge, and HEANEY, Circuit Judge, and ROSENN,[*] Senior Circuit Judge.

LAY, Chief Judge.

This appeal arises from the joint trial of eleven defendants charged with the first degree murder of Jerome Edward Peltier on August 28, 1983, on the Devils Lake Indian Reservation. The government alleged that the defendants attacked Peltier at a party at the Juarez residence on the reservation, chased him to a highway, beat him, and left him lying in the road. One of the defendants, Richard John (Ricky) La-Fuente, allegedly then drove over Peltier with LaFuente's 1971 GMC Sprint (El Camino), resulting in Peltier's death. The government's investigation proved fruitless until nearly two years later when an eyewitness to the attack, Patricia DeMarce, told the police her recollection of what happened on August 28, 1983.

The government eventually indicted the eleven defendants, charging them with first degree murder, 18 U.S.C. § 1111 (Supp. III 1985), and assault resulting in serious bodily injury, 18 U.S.C. § 113(f) (1982). Additional charges of witness tampering were filed against defendants Loren Grey Bear (three counts), Jesse Cavanaugh (five counts), LaFuente (one count), and John Perez (one count). 18 U.S.C. § 1512 (1982). Grey Bear and Leonard Fox were also charged with perjury. 18 U.S.C. § 1623 (1982).

On April 14, 1986, the jury trial of the eleven defendants commenced in federal district court.[1] Following a six-week trial and three days of deliberations, the jury found LaFuente guilty of first degree murder, Maynard Dunn guilty of assault resulting in serious bodily injury, and the remaining nine defendants[2] guilty of second degree murder. Grey Bear, Perez, and Jesse Cavanaugh were also found guilty of witness tampering and Grey Bear and Fox were convicted of perjury. All eleven defendants jointly appeal their convictions, raising the following issues: (1) insufficiency of the evidence; (2) verdicts contrary to the weight of the evidence; (3) inadequate jury instructions on intent; (4) inadequate jury instructions on eyewitness identification; (5) the trial court's failure to allow corroborating testimony of defendants' expert medical witness; (6) improper closing argument by the prosecutor; (7) improper jury selection; (8) failure to grant defendants' motion for change of venue; (9) failure to allow cross-examination of a government witness; and (10) lack of subject matter jurisdiction. The defendants also raise the court's failure to sever them from the joint trial.[3]

[*] The Hon. Max Rosenn, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1. The Honorable Paul Benson, Senior Judge, United States District Court for the District of North Dakota.

2. Loren Grey Bear, Jesse Cavanaugh, Paul Cavanaugh, Tayron (Terry) Dunn, Leonard Fox, John Perez, Timothy Longie, Jr., Roger Charboneau, and Dwayne Charboneau.

3. Some of the defendants also raise other issues. Paul Cavanaugh challenges: (1) the court's denial of his request to subpoena two witnesses; and (2) the court's refusal to strike a question and answers regarding the defendant's fighting with the boyfriend of the victim's sister. Grey Bear challenges the trial court's allowance of the

We find sufficient evidence exists to sustain the first degree murder conviction of LaFuente, as well as the second degree murder and witness tampering convictions of Perez. We also find sufficient evidence to sustain the convictions of Grey Bear for perjury and witness tampering, Jesse Cavanaugh for witness tampering, and Fox for perjury. Nonetheless, we reverse those convictions because it was prejudicial error not to grant their motions for severance under Fed.R.Crim.P. 8(b). We further find there was insufficient evidence to sustain the other convictions for second degree murder and Dunn's conviction for assault resulting in serious bodily injury.

We turn first to the jurisdictional issue.

## I. Jurisdiction

Defendants assert that the district court lacked subject matter jurisdiction under 18 U.S.C. §§ 1152, 1153 (1982)[4] because the Devils Lake Sioux Indian Reservation had been disestablished by treaty between the Indians and the United States and by congressional act. See Act of April 27, 1904, ch. 1620, 33 Stat. 319, 321. The district court denied the defendants' motions to dismiss, holding that the language of the act at issue, the circumstances surrounding its passage, including its legislative history, and subsequent treatment of the land all indicated that the reservation was not disestablished and that jurisdiction was therefore proper. United States v. Grey Bear, 636 F.Supp. 1551, 1556–57 (D.N.D.1986).

Once Congress has established a reservation, all of its tracts remain a part of the reservation until Congress says otherwise. See DeCoteau v. District County Court for the Tenth Judicial Dist., 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975); United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909). Only Congress can divest a reservation of its land, diminish its boundaries, or disestablish it altogether. See Solem v. Bartlett, 465 U.S. 463, 470, 104 S.Ct. 1161, 1166, 79 L.Ed.2d 443 (1984); Mattz v. Arnett, 412 U.S. 481, 505 & n. 23, 93 S.Ct. 2245, 2258 & n. 23, 37 L.Ed.2d 92 (1973). A strong presumption prevails that reservation lands and boundaries are to remain intact. See Solem, 465 U.S. at 472, 104 S.Ct. at 1167; DeCoteau, 420 U.S. at 444, 95 S.Ct. at 1092. Accordingly, before disestablishment or diminishment of reservation boundaries will be found, a clear congressional intent to do so must be established. Solem, 465 U.S. at 470, 104 S.Ct. at 1166; Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977). The Supreme Court has cited three primary factors a court must consider to determine congressional intent with respect to this issue: the face of the relevant act, events surrounding its passage, including legislative history, and subsequent treatment of the land. Rosebud, 430 U.S. at 587, 97 S.Ct. at 1363; Mattz, 412 U.S. at 505 & n. 25, 93 S.Ct. at 2258 & n. 25. We consider each of these factors in turn.

prosecution's leading questions in eliciting the testimony of Patricia DeMarce, its primary witness. LaFuente challenges: (1) the denial of his request to present impeachment testimony against government witness Mary McDonald; (2) the denial of his requested jury instruction regarding the nature of the charge and examination of testimony; (3) the court's refusal to allow counsel to comment regarding the prosecution's failure to call certain witnesses; (4) the court's refusal to allow him to review DeMarce's medical records; and (5) the court's requirement that he turn over work product information with respect to an alibi witness.

4. 18 U.S.C. § 1153 provides: "Any Indian who commits against the person * * * of another Indian * * * murder [or] * * * assault resulting in serious bodily injury * * * within the Indian country, shall be subject to the same law

and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." Section 1151 defines "Indian country" as:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (1982).

## A. Statutory Language

The language of the act ordinarily is the most probative evidence of congressional intent. *See Solem*, 465 U.S. at 470, 104 S.Ct. at 1166. In the present case, the statutory language used to open the Devils Lake Indian Reservation provided as follows:

Article I. The said Indians belonging on the Devils Lake Indian Reservation, North Dakota, for the consideration hereinafter named, do hereby *cede, surrender, grant, and convey* to the United States all their claim, right, title, and interest in and to all that part of the Devils Lake Indian Reservation now remaining unallotted * * * except six thousand one hundred and sixty acres required for allotments to sixty-one Indians of said reservation entitled to allotments, but to whom allotments have not yet been made * * *.

Article II. In consideration of the land ceded, relinquished, and conveyed by article one of this agreement * * * the United States stipulates and agrees to dispose of the said lands to settlers under the provisions of the homestead and town-site laws * * * and to pay to said Indians the proceeds derived from the sale of said lands * * *.

Act of April 27, 1904, ch. 1620, 33 Stat. 321–22 (emphasis added).

The Supreme Court has held that such explicit reference to cession suggests that Congress intended to divest the reservation of its land. *See Solem*, 465 U.S. at 470, 104 S.Ct. at 1166. The Court has further held that "[w]hen such language of cession is buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land, there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." *Id.* at 470–71, 104 S.Ct.

at 1166. We agree with the district court's analysis that although the "cede, surrender, grant, and convey" language of the Act suggests congressional intent to disestablish the reservation boundaries, *see Rosebud*, 430 U.S. at 597, 97 S.Ct. at 1368; *DeCoteau*, 420 U.S. at 445, 95 S.Ct. at 1093, the Act does not contain an *unconditional* commitment by Congress to pay the tribe for the ceded lands. *Grey Bear*, 636 F.Supp. at 1554. Compensation for the lands was not set at any fixed price and the tribe was guaranteed reimbursement only for the lands actually disposed of by the government. Thus, the "almost insurmountable presumption" of disestablishment urged by defendants is not present in this case.

■ We conclude that the "cede, surrender, grant, and convey" language of the 1904 Act, standing alone, does not evince a clear congressional intent to disestablish the Devils Lake Reservation. In the past, when Congress has intended to disestablish a reservation, it generally has forthrightly stated this intention. *See Mattz*, 412 U.S. at 504 n. 22, 93 S.Ct. at 2258 n. 22 (citing three examples: 15 Stat. 221 (1868) ("the Smith River Reservation is hereby discontinued"); 27 Stat. 63 (1892) (a portion of the Colville Indian Reservation is "vacated and restored to the public domain"); 33 Stat. 218 (1904) ("the reservation lines of the said Ponca and Otoe and Missouria Indian reservations be, and the same are hereby abolished")). We find no such expression of congressional intent here, and we refuse, without more, to infer one.[5]

## B. Legislative History

■ The legislative history of the 1904 Act is not extensive. It was passed four days after the Act of April 23, 1904, ch. 1484, 33 Stat. 254, which diminished the Rosebud Indian Reservation. *See Rose-*

---

**5.** In so holding, we recognize that the same statutory language was present in at least three cases in which the Supreme Court found diminishment or disestablishment. *See Oregon Dept. of Fish & Wildlife v. Klamath Ind. Tribe*, 473 U.S. 753, 760, 105 S.Ct. 3420, 3425, 87 L.Ed.2d 542 (1985); *Rosebud*, 430 U.S. at 597, 97 S.Ct. at 1368; *DeCoteau*, 420 U.S. at 437, 95 S.Ct. at

1089. A careful reading of these cases, however, reveals that the Court did not rely solely upon this language of cession in reaching its conclusions. It also considered other important factors such as payment of a lump sum upon surrender of the lands, express agreement by the tribe of its intent to disestablish the reservation, and surrounding circumstances.

*bud,* 430 U.S. at 605, 615, 97 S.Ct. at 1372, 1377. Apparently Congress had the issues well in mind by the time the Devils Lake bill came up for debate, because discussion of the bill was extremely limited.[6] The legislative history of the Act therefore is inconclusive and does nothing to overcome the strong presumption favoring retention of reservation status.

### C. Subsequent Treatment of the Land

The district court took judicial notice of the fact, which defendants do not dispute, that historically the federal and tribal courts and the Secretary of the Interior have exercised and continue to exercise jurisdiction over Indians within the boundaries of the reservation as delineated by the original 1867 treaty with the Devils Lake Tribe. Indeed, the investigation of Eddie Peltier's death was conducted by the Bureau of Indian Affairs and the Federal Bureau of Investigation. Jurisdictional history of disputed lands is an important factor because it reveals the traditional understanding of the Act, which has created justifiable expectations that should not be upset by a strained reading of the Act. *Rosebud,* 430 U.S. at 603–05, 97 S.Ct. at 1371–72; *see also DeCoteau,* 420 U.S. at 442–44, 95 S.Ct. at 1091–92.

Finally, subsequent congressional enactments indicate that Congress itself does not view the 1904 Act as having disestablished the reservation's boundaries. *See Mattz v. Arnett,* 412 U.S. 481, 505 n. 25, 93 S.Ct. 2245, 2258 n. 25, 37 L.Ed.2d 92 (1973) ("Although subsequent legislation usually is not entitled to much weight in construing earlier statutes, it is not always without significance.") (citations omitted).

In the Devils Lake Sioux Reservation Indian Land Consolidation Act, Congress recently expressed its position that the Devils Lake Reservation was not disestablished. *See* Pub.L. No. 97–459, 96 Stat. 2515 (1983) (referring to the "continued existence of the Devils Lake Reservation"). The House Report on this statute refers to the 1904 Act as having opened up the reservation for settlement, but makes no mention of disestablishment or diminishment of the reservation's boundaries. *See* H.R. Rep. No. 97–908, 97th Cong., 2d Sess. 5 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 4415.

In addition, in 1946, Congress authorized the assumption of North Dakota jurisdiction over the Devils Lake reservation, explicitly declaring the state's jurisdiction to be concurrent with federal jurisdiction over the reservation. *See* Act of May 31, 1946, ch. 279, 60 Stat. 229. Clearly, Congress itself has not viewed the 1904 Act as having disestablished the reservation boundaries.

■ In conclusion, we hold that the defendants have not overcome the strong presumption favoring retention of reservation status and boundaries absent a clear congressional mandate to the contrary.[7] The district court's assumption of jurisdiction over this prosecution was proper.

### II. Sufficiency of Evidence

In reviewing claims of insufficient evidence to support a conviction, this court must view the evidence in the light most favorable to the verdict and accept all reasonable inferences favorable to the government that logically can be drawn from the evidence. *See, e.g., United States v. Gleason,* 766 F.2d 1239, 1246 (8th Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 801,

---

**6.** In his remarks to the House, Representative Marshall noted that little discussion was necessary due to the similarity to the Rosebud bill, but he did refer to the Devils Lake bill as opening up the reservation for settlement. *See* 38 Cong.Rec. 1642 (1904). We note that the mere fact that a reservation has been opened to settlement does not necessarily point to disestablishment. *See Rosebud,* 430 U.S. at 586–87, 97 S.Ct. at 1362–63.

**7.** In so holding, we acknowledge the proclamations by Presidents Woodrow Wilson and Calvin Coolidge, referring to the "former" Devils Lake Indian Reservation, *see* 39 Stat. 1776 (1916); 43 Stat. 1966 (1924), as well as a 1971 Department of the Interior opinion by an associate regional solicitor, concluding that the 1904 Act extinguished tribal title to reservation land. In view of our discussion of the other factors noted above, we find this evidence relevant but not compelling to our determination.

88 L.Ed.2d 777 (1986). The court must also resolve evidentiary conflicts in the government's favor and sustain the jury's verdict if there is substantial evidence to support it. *See Rothgeb v. United States*, 789 F.2d 647, 648 (8th Cir.1986); *United States v. Gatewood*, 786 F.2d 821, 824 (8th Cir.1986). The evidence, however, must do more than raise a mere suspicion or possibility of guilt. *United States v. Jones*, 545 F.2d 1112, 1115 (8th Cir.1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977) (holding the evidence insufficient to convict defendant of conspiracy to distribute heroin, this court observed, "Surmise cannot be permitted in a criminal case"); *see also United States v. Wilson*, 665 F.2d 825, 830 (8th Cir.1981), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982).

As we noted in *United States v. Knife*, 592 F.2d 472 (8th Cir.1979), "[w]e are well aware that the standard to be applied by an appellate court in determining sufficiency of the evidence is a strict one and that a jury's determination should not be overturned lightly." *Id.* at 475 (reversing conviction for aiding and abetting assault on a police officer). If, however, the evidence taken as a whole, including that offered by the defendant, *see United States v. Beck*, 615 F.2d 441, 448 (7th Cir.1980), reaches such a level that a reasonably minded jury must have a reasonable doubt as to the existence of one of the essential elements of the crime, we are compelled to overturn that verdict. *See Rothgeb*, 789 F.2d at 648; *United States v. Netz*, 758 F.2d 1308, 1310 (8th Cir.1985).

■ The government contends that Ricky LaFuente murdered Eddie Peltier by running Peltier over in LaFuente's El Camino and that LaFuente was aided and abetted in this act by each of his ten codefendants. Title 18 U.S.C. § 2(a) (1982) mandates that whoever "aids, abets, counsels, commands, induces or procures" an offense against the United States "is punishable as a principal." To fall within this proscription, a defendant must "in some sort associate himself with the venture, that he participate in it as something he wishes to bring about, that he seek by his action to make it succeed." *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)); *see also United States v. Larson*, 760 F.2d 852, 858 (8th Cir.), *cert. denied*, 474 U.S. 849, 106 S.Ct. 143, 88 L.Ed.2d 119 (1985); *United States v. Anziano*, 606 F.2d 242, 244–45 (8th Cir.1979). The government must demonstrate that the defendants affirmatively participated in the criminal act, thus encouraging the principal in the commission of the act. *United States v. Murry*, 588 F.2d 641, 645 n. 5 (8th Cir.1978).

We have previously observed that "[b]y far the most important element is the sharing of the criminal intent of the principal, and this is concededly difficult to prove; nevertheless the Government must prove this sharing of criminal intent." *Snyder v. United States*, 448 F.2d 716, 718 (8th Cir. 1971); *see also United States v. Wilson*, 665 F.2d 825, 830 n. 6 (8th Cir.1981) (conviction for aiding and abetting requires a finding of the same criminal intent as a conviction for first degree murder), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982); *United States v. Moody*, 462 F.2d 1307, 1308 (8th Cir.1972) (essential element of aiding and abetting is knowledge of one's participation in illegal transaction). In *Johnson v. United States*, 195 F.2d 673 (8th Cir.1952), we stated:

> Generally speaking, to find one guilty as a principal on the ground that he was an aider and abetter, it must be proven that he shared in the criminal intent of the principal and *there must be a community of unlawful purpose at the time the act is committed.* As the term "aiding and abetting" implies, it assumes some participation in the criminal act *in furtherance of the common design,* either before or at the time the criminal act is committed.

*Id.* at 675 (emphasis added).

■ It follows, and has often been stressed by this court, that mere presence at the scene of the crime is insufficient proof on which to base an aiding and abetting conviction. *See, e.g., Larson,* 760 F.2d

at 858; *United States v. Lard*, 734 F.2d 1290, 1298 (8th Cir.1984); *Anziano*, 606 F.2d at 245. Mere association with the principal and even knowledge that a crime is about to be committed are also insufficient to support an aiding and abetting conviction without proof of culpable purpose. *Larson*, 760 F.2d at 858; *Snyder*, 448 F.2d at 718, *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir.1971). As we noted in *Kelton*, "[t]he necessity for proving facts other than presence has been explained as 'an essential safeguard against the ever present danger of *assuming the complicity* of all in attendance whenever group activity is involved.'" 446 F.2d at 671 (quoting *United States v. Barber*, 429 F.2d 1394, 1397 (3d Cir.1970) (emphasis added in *Kelton*). Aiding and abetting, therefore, requires conduct of an affirmative nature; mere negative acquiescence in a crime is insufficient. *Johnson*, 195 F.2d at 675.

With these principles in mind, we turn to the defendants' claims that the evidence presented in this case was insufficient upon which to base their convictions.

## A. Ricky LaFuente

■ Ricky LaFuente was convicted of first degree murder of Eddie Peltier. There is no question that Eddie Peltier died as a result of having been struck by a motor vehicle. LaFuente, however, disputes the government's allegations that he and his El Camino were involved. LaFuente testified that he had never been to the Juarez residence and was not there the evening that Eddie Peltier was killed. He claims that early in the evening on August 27, 1983, he left Angeline Dunn's house, where he was staying at the time, and probably went to visit Maynard Dunn. He remembers returning to the Dunn home between 10:30 and 11:30 p.m. and calling his wife in Texas at midnight, producing telephone company records to back this up. He then fell asleep in the living room watching television and remained there until the next morning. He offered the testimony of Calvin Dean Dunn and Kevin Brownshield, who also slept in the living room, to corroborate this account.

Government witnesses Patricia DeMarce, Mary McDonald, and Shirley Greywater, however, place LaFuente at the party at the Juarez residence in the early morning hours of August 28. Greywater stated that she saw LaFuente with Dwayne Charboneau and another person she did not know, standing in the Juarez yard with Geno DuBois. DuBois was arguing with Eddie Peltier over an allegation that Peltier had been a police officer and was now selling marijuana. Greywater testified that after that argument died down, another later started between Peltier and DuBois. Everyone then ran from the yard, and Greywater said she observed the El Camino pull out of the driveway along with the other vehicles that presumably headed down to Highway 57. Greywater did not go down to Highway 57 herself. Fred Peltier, another government witness who was at the party that night, did not specifically identify LaFuente as being at the party, but he did see LaFuente's El Camino both at the party and down on Highway 57 when the fight was taking place.

DeMarce testified that LaFuente drove her to the party at the Juarez residence in his El Camino along with John Perez and Maynard and Terry Dunn. She stated they arrived at 9:00 or 10:00 p.m. She further stated that two hours after they arrived, LaFuente left the party to get beer and was gone for an hour or more. Later, he left again to pick somebody up. She did not know who LaFuente went to get, and she did not know how long he was gone this second time. After the initial skirmish in the yard, DeMarce stated that she got into the "box" of LaFuente's El Camino. She testified he drove her toward Ski Jump Road before stopping and ordering her out. She stated that she ran through the woods to Highway 57 and observed a succession of fights between Eddie Peltier and certain defendants, specifically identifying LaFuente as having struck Peltier. After Terry Dunn and Perez dragged Peltier back onto the road, DeMarce testified that she saw LaFuente, driving his El Camino, run over Eddie Peltier, back over Peltier again, and then leave the scene.

Mary McDonald testified that LaFuente brought his car to a stop at the intersection of Highway 57 and Ski Jump Road. Everyone but Maynard Dunn got out of the car and headed toward the fighting. At this time, she stated, she put her head down so that she would not have to watch the fighting. When the others returned, McDonald testified, LaFuente started the El Camino and ran over Eddie Peltier, who was lying in the road. Contrary to DeMarce's testimony, she did not observe the car back over Peltier.

LaFuente argues that the physical evidence does not corroborate the government's theory that LaFuente killed Peltier with his El Camino. He claims that the government failed to prove that the six-inch tire marks on the highway adjacent to where Peltier's body was found were made by his El Camino. When LaFuente came to North Dakota from Texas in early August, 1983, he had eleven-inch "mag" rear tires on his El Camino. One of those tires blew out during his stay here and he had to replace them both with regular six-inch spares. LaFuente claims that the mag tires were on the vehicle that evening and they could not possibly have made the six-inch wide skid marks on the highway. Even if the spares had been on the wheels at the time, LaFuente contends, a police officer's comparison of skid marks left by LaFuente's spares three weeks after Peltier's death and those on the highway showed that the tire marks were not made by the spares either. LaFuente's arguments, however, are of no avail. At his pretrial detention hearing, LaFuente stated that the wide tires were *not* on the car at the time of Peltier's death. He also admitted to rotating the front tires to the back and vice versa at various times after Eddie Peltier's death. It cannot be determined which tires were on the El Camino on August 28.

The remainder of LaFuente's argument goes primarily to the credibility of witnesses. We must agree that the testimony conflicts in several respects. Nevertheless, when testimony conflicts the responsibility of deciding the issue of credibility, except in the most compelling circumstances, lies with the jury. *See, e.g., United States v. Wade,* 740 F.2d 625, 628 (8th Cir.1984); *United States v. Harrison,* 671 F.2d 1159, 1162 (8th Cir.), *cert. denied,* 459 U.S. 847, 103 S.Ct. 104, 74 L.Ed.2d 94 (1982).

We therefore conclude that viewing the evidence in the light most favorable to the government, there is substantial evidence in the record to support the verdict finding LaFuente guilty of first degree murder. LaFuente's claim of insufficiency of evidence must be rejected.

## B. John Perez

■ John Perez was convicted of second degree murder and one count of witness tampering. Both DeMarce and McDonald testified that Perez was involved in the beating and death of Eddie Peltier, but their accounts of his involvement conflict.[8] DeMarce stated that Perez rode to the party at the Juarez residence in the El Camino with LaFuente. After the initial fight broke out and Eddie Peltier ran toward the highway, DeMarce said that Perez rode in the front of the El Camino with LaFuente, Terry Dunn, and an unidentified person as they drove down Ski Jump Road toward Highway 57. When DeMarce returned to Highway 57 after running up to the residence to get help, she testified, she saw Perez chase Peltier through the north ditch along with Terry Dunn and Tim Longie. She claimed she saw Perez go to the El Camino to retrieve a set of silver num chucks, and then strike Peltier with the num chucks while other defendants also beat Peltier with their hands and feet.

DeMarce stated that Peltier broke away from the crowd and tried to run across the highway and up an embankment. Terry Dunn and Perez chased and caught Peltier and dragged him back to the highway. DeMarce testified that she then saw Perez, standing near Peltier, give a signal to LaFuente, who was waiting in the El Camino. LaFuente then accelerated the car and ran

---

**8.** Perez testified and presented corroborating testimony that he remained at the Angeline Dunn residence from the early evening hours of August 27 until well after dawn on August 28.

over Peltier. DeMarce could not recall exactly what kind of signal Perez gave LaFuente.

While Mary McDonald's account of the incident differed from DeMarce's, she corroborated that Perez was at the party and rode with LaFuente to Highway 57 in pursuit of Peltier. She stated that Perez got out of the vehicle with the others, but did not remember him returning at any time to retrieve num chucks. She stated that Perez returned to the El Camino with LaFuente and was riding in the vehicle when LaFuente drove over Eddie Peltier. McDonald also provided the only evidence supporting Perez's conviction for witness tampering, relating that immediately after Peltier's death, he told her that if she ever said anything about the incident, he would hurt her parents.

As with the evidence against LaFuente, the evidence against Perez was testimonial and must be weighed according to the relative credibility of the witnesses offering it. DeMarce testified that she saw Perez give a signal to LaFuente just before LaFuente ran down Peltier. The jury was entitled in its discretion to give credence to this testimony, a reasonable inference being that Perez was communicating to LaFuente his intention that LaFuente should hit Peltier with the car. Similar credence could reasonably be given to Mary McDonald's testimony about Perez's threat. We believe that these are reasonable inferences to be logically drawn from the evidence and, resolving all evidentiary conflicts in favor of the government, that the evidence was sufficient to sustain Perez's convictions for second degree murder and witness tampering. *See Rothgeb*, 789 F.2d at 648; *Gleason*, 766 F.2d at 1246.

### C. Maynard Dunn

Maynard Dunn was convicted of assault resulting in serious bodily injury. The only evidence in the trial that could support his conviction for this offense was Fred Peltier's testimony that Maynard Dunn "threw a punch" at Eddie Peltier. DeMarce testified that although Maynard Dunn was with the others on the road, he did not participate in the actual beating of Eddie Peltier. In fact, cross-examination revealed that DeMarce told the grand jury that Maynard Dunn never even got out of the back of the El Camino because he was too drunk to walk. Mary McDonald testified that Dunn originally waited in the El Camino and told her he did not want to get involved. He later got out of the vehicle, according to McDonald, but she did not know what he did following that.

■ We believe the evidence was insufficient to convict Maynard Dunn of assault resulting in serious bodily injury. The only evidence in the record to support such a verdict is Fred Peltier's testimony that Maynard Dunn "threw a punch." Peltier could not recall the point in the fighting at which Dunn threw this punch, where on Eddie Peltier's body the punch landed, or what type of injury, if any, Dunn may have inflicted on Eddie Peltier.

The jury was properly instructed by the trial court that "serious bodily injury means something more than slight bodily injury. It means bodily injury of a grave and serious nature. It does not necessarily have to be an injury which is life threatening however." There is simply no evidence of *any* injury to Peltier as a result of this punch. We agree that it could be argued that by Dunn's presence and by throwing the punch, he implicitly encouraged others in their more severe attack on Peltier, thus being guilty of aiding and abetting the assault and punishable as a principal. Given the lack of any context in which the alleged punch was thrown, however, and Dunn's statement to McDonald that he did not want to get involved, it cannot be determined whether Dunn's actions actually encouraged the assault on Peltier. *See Murry*, 588 F.2d at 645 n. 5 (government must show affirmative participation in crime, which encouraged principal in committing the act). As we stated above, Dunn cannot be convicted of assault resulting in serious bodily injury merely because he was at the scene of the assault or because he was associated with other defendants. *See Larson*, 760 F.2d at 858. Speculation

alone, without compelling evidence to support it, cannot sustain a conviction.

Viewing the evidence in the light most favorable to the government, we cannot agree that the evidence was sufficient to support Maynard Dunn's conviction for assault. Even giving the government the benefit of every reasonable inference, we conclude that a reasonably minded jury must have a reasonable doubt as to Dunn's guilt. *Larson*, 760 F.2d at 858.

### D. Remaining Defendants

█ Jesse and Paul Cavanaugh, Loren Grey Bear, Terry Dunn, Tim Longie, Leonard Fox, and Roger and Dwayne Charboneau were each convicted of second degree murder. Each defendant was identified by DeMarce, McDonald, or Fred Peltier as having taken an active role in the beating of Eddie Peltier at various stages of the fight. There was, however, no evidence with respect to any of these defendants that suggests that they *intended* to participate in the killing of Peltier. DeMarce stated that after Perez and Dunn chased Peltier up the embankment and dragged him back to the road, Longie, Fox, Terry Dunn, and Jesse Cavanaugh stood around Peltier beating him, "then the El Camino came." DeMarce, however, offered no time sequence for these actions. There is no way to know whether there was a break between the time the beating stopped and the time the run-over occurred.

DeMarce also testified that after Peltier was dragged onto the highway, two individuals, whose identities she did not remember, held Peltier down with their feet. Again, however, there was no context offered for this testimony. The record does not reveal when Peltier was held down in this manner in relation to the run-over. The government's inference was that these individuals held Peltier down so that the El Camino could hit him. Given the lack of context of the testimony, however, an equally plausible explanation is that they held him down while the others beat him, or even that they held him down as a display of force or dominance over Peltier. Peltier could have then been run over at some later time, without the prior knowledge of the other defendants.

Fred Peltier, the victim's brother, testified that he turned away after Eddie was dragged to the roadway. Fred said he next heard tires screeching but did not estimate the length of time between when he turned away and when he heard the screeches. Because he had turned away, he did not know what any of the defendants were doing before the El Camino ran over his brother.

There thus is *no* evidence in the record that these defendants intended to participate in the killing of Eddie Peltier. As we stated in *Snyder*, "[b]y far the most important element [in proving guilt by aiding and abetting] is the sharing of criminal intent." 448 F.2d at 718. The only evidence that these defendants intended Peltier to die by their actions is that they beat him and left him on the highway. An equally strong inference to be drawn from the evidence is that these defendants had finished with Peltier and left him in the road when LaFuente independently ran over Peltier. We have held that "where the government's evidence is equally strong to infer innocence of the crime charged as it is to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." *Kelton*, 446 F.2d at 671. This is precisely the situation facing us here.

In so concluding, we note the remarks made by the trial court at the sentencing hearing of Terry Dunn. The court observed:

> It is also obvious that there was no equal degrees of culpability involved on the part of each of these defendants, but because of the defense that the, each defendant chose to present, there was no way to judge what the degree of culpability of each defendant was, ... So the jury was left with no room and found that the defendants, or that the victim was murdered, they were found with no room to determine whether some of the defendants may have been less culpable than the others because they obviously found that all were involved * * *

And if all of the evidence, which appears to me did not come into this case, had been presented and if some of these defendants had taken the stand and frankly testified truthfully as to their minimal participation, probably would have been some very lenient verdicts returned, or even some acquitals [sic] returned as to some of the defendants.

Given these observations and, more importantly, our conclusions after scrutinizing the entire record, we are convinced that the second degree murder convictions of the Cavanaughs, the Charboneaus, Longie, Fox, Grey Bear, and Terry Dunn stem from the "ever present danger of assuming the complicity of all in attendance whenever group activity is involved." *United States v. Barber,* 429 F.2d 1394, 1397 (3d Cir.1970). This danger was exacerbated by the government's prejudicial argument that this was an "all or nothing case, all guilty or all not guilty." At another point in its closing argument, the government urged that "if one is guilty, it's a pretty fair conclusion that all are guilty."

We believe the jury's tendency to find guilt by association is the only plausible explanation for the second degree murder convictions against these defendants. Evidence must do more than raise the mere possibility of guilt. *Wilson,* 665 F.2d at 830. In this case, the government's evidence of intent was so scant that the jury could only speculate as to the guilt of the above-named defendants. We therefore hold that the evidence was insufficient to sustain the second degree murder convictions of Jesse Cavanaugh, Paul Cavanaugh, Tim Longie, Leonard Fox, Terry Dunn, Loren Grey Bear, Roger Charboneau, and Dwayne Charboneau.

 The jury also rendered guilty verdicts against Grey Bear for one count of perjury and witness tampering, Jesse Cavanaugh for one count of witness tampering,

and Fox for one count of perjury. We hold that the evidence was sufficient to sustain these convictions. Grey Bear and Cavanaugh were each convicted for threatening Fred Peltier into silence immediately after Eddie Peltier was killed. The only evidence of this threat was through the testimony of Fred Peltier. Peltier stated that after he turned away from the fighting and heard the tires squeal, Cavanaugh and Grey Bear approached him, Billy Fox, and Bruce and Kevin Mindt, and "told us not to say anything, we'd get the same thing." As with the evidence against LaFuente and Perez, whether or not this actually occurred rests entirely upon Fred Peltier's credibility. Accordingly, we must defer to the jury's judgment in the matter.

Grey Bear was also convicted of perjury for making false statements to the grand jury on September 9, 1983. In that testimony, Grey Bear stated that he was not at the party at the Juarez residence. Credible evidence introduced at trial showed that Grey Bear was at this party. We conclude the evidence was sufficient to sustain the perjury conviction.

Leonard Fox was also convicted of perjury for making false statements to the grand jury on October 29, 1985. In that testimony, Fox stated he was not at the Juarez residence the night Eddie Peltier was killed. As with Grey Bear, credible evidence was introduced indicating otherwise. Sufficient evidence supported Fox's perjury conviction.

### III. Severance

 At various times before and during trial, the eleven defendants moved for severance of counts and defendants pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure.[9] We need address only the joinder under Rule 8(b) of LaFuente, Perez, and those defendants convicted of witness tampering or perjury.

---

**9.** The government contends that Fox, LaFuente, Jesse Cavanaugh, and Maynard and Terry Dunn merely requested a severance of counts and have therefore waived their right to raise misjoinder of defendants on appeal. Our review of the relevant motions, however, reveals that each of these defendants did in fact file motions for

severance of counts and defendants. We recognize that while these defendants did conclude the portions of the supporting memoranda addressing Rule 8(b) with a request for separate trials on the severable *counts,* we cannot ignore their references, arguments, and citations to the issue of misjoinder of defendants.

Federal Rule of Criminal Procedure 8(b) provides:

> Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

This court must undertake a two-step analysis in assessing the defendants' arguments under Rule 8(b). First, we must determine whether the propriety of joinder appears on the face of the indictment. *United States v. Andrade*, 788 F.2d 521, 529 (8th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986); *United States v. Bledsoe*, 674 F.2d 647, 655 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). The indictment must charge the joined defendants with having participated in the same act or transaction or in the same series of acts or transactions alleged to constitute an offense.[10] Second, if misjoinder is apparent on the face of the indictment, a reversal is required "only if the misjoinder result[ed] in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)) (discussing harmless error rule of Fed.R. Crim.P. 52(a)).[11]

**A. Misjoinder**

▮▮▮ In the present case, counts I and II of the indictment alleged that all eleven defendants participated in the assault and murder of Eddie Peltier. The remaining counts, however, separately charged five of the defendants (Grey Bear, LaFuente, Perez, Fox, and Jesse Cavanaugh) with witness tampering and perjury. We have previously observed that Rule 8(b) requires "some common activity involving *all* of the defendants which embraces *all* the charged offenses even though every defendant need not have participated in or be charged with each offense." *Bledsoe*, 674 F.2d at 656 (emphasis added). Furthermore, to be part of the "same series of acts," the offenses charged must be part of one overall scheme about which all joined defendants knew and in which they all participated. *Id.; United States v. McKuin*, 434 F.2d 391, 395–96 (8th Cir.1970), *cert. denied*, 401 U.S. 911, 91 S.Ct. 875, 27 L.Ed.2d 810 (1971).

The district court found that the "offenses charged in the indictment in this case all arise from an alleged common scheme, the commission and concealment of the assault and murder of Eddie Peltier." *Grey Bear*, Cr. No. C2-85-69 (D.N.D. March 20, 1986) (order denying motions for severance). Yet the indictment in this case did not allege, even inferentially, that all of the defendants participated in the alleged witness tampering or perjury by the five above-named defendants. In fact, the indictment did not allege, with the exception of the statements made by Cavanaugh and Grey Bear to Fred Peltier and the others on the highway, that these five defendants even participated in each others' offenses occurring after Eddie Peltier's death. There was no allegation, nor any evidence, of an overall scheme to cover up the circumstances of Peltier's death encompassing *all* the defendants.[12] *Bledsoe*, 674 F.2d at 656–57. We therefore hold

---

**10.** Compare this requirement with the less stringent mandates of Fed.R.Crim.P. 8(a), regarding joinder of counts against a single defendant, which permits joinder of counts which are "of the same or similar character." Under Rule 8(b), mere similarity of offenses is insufficient.

**11.** *United States v. Lane* overruled the 1896 decision of *McElroy v. United States*, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355 (1896), which held the harmless error rule not applicable to a denial of a motion to sever.

**12.** It is true that Grey Bear and Cavanaugh were convicted on the charge that they *jointly* threatened Fred Peltier after his brother's death. Yet, because Grey Bear was also charged with and convicted of perjury, which had no connection to or commonality with Cavanaugh, it was error under Rule 8(b) to try Cavanaugh and Grey Bear jointly on these charges.

that the defendants were misjoined under Rule 8(b).

## B. Prejudice

■ Misjoinder becomes prejudicial when it has a substantial and injurious influence in determining the jury's verdict. *Lane,* 106 S.Ct. at 732. We are convinced that the misjoinder of defendants in this case did substantially and injuriously taint the jury's deliberations and verdicts. Our conclusion is based on several considerations.

First, the joinder of the eleven defendants charged with the same crime, coupled with the urging of the government that "all are guilty or none are guilty," created the impermissible implication that if one defendant were guilty of the underlying crime, then all were guilty of that crime. The government's all or nothing strategy in this case tended to ease the government's burden of proving beyond a reasonable doubt the guilt of each individual defendant. This in turn encouraged the jury's tendency to find guilt by association in a multiple-defendant trial. Significantly, the jury appears to have accepted the government's all or nothing approach; it found each defendant guilty of murder or assault despite the insufficiency of the evidence with respect to nine defendants.

Second, the evidence of witness tampering and perjury by several defendants implied that a murder had in fact been committed. Yet attempts by *other* defendants to conceal the crime, in a case in which no conspiracy is alleged, are irrelevant to the question of an individual defendant's guilt. We are convinced after examining the record, however, that the implications of these cover-up attempts substantially and prejudicially influenced the jury's verdicts as to all defendants on all of the charges.

Finally, we must point out once again that the government's evidence in this case was not overwhelming.[13] The testimony of the government's key witnesses conflicted in several significant respects. The government produced no physical evidence to substantiate its charges; the available physical evidence—tire marks on the road where Peltier's body was found—was inconclusive. In such a case, courts must be particularly sensitive to the dangers of prejudice and guilt by association. *Cf. Lane,* 106 S.Ct. at 732 (misjoinder was harmless when trial court gave limiting instruction, evidence as to unrelated count would have been admissible anyway, and evidence was overwhelming). Although the trial court gave an appropriate cautionary instruction, the "spill-over" danger inherent in multiple-defendant trials was all too manifest in this case. We hold that the misjoinder of defendants was prejudicial error, requiring new trials for LaFuente, Perez, Fox, Grey Bear, and Jesse Cavanaugh.

LaFuente and Perez may be joined together on the retrial of their murder charge if, and only if, the charge of witness tampering against Perez is tried separately. Grey Bear and Cavanaugh may be tried jointly on the witness tampering charge if, and only if, the charge of perjury against Grey Bear is tried separately. Fox must be tried alone on his perjury charge.

## IV. Conclusion

A new trial is ordered for LaFuente on the first degree murder charge; a new trial is ordered for Perez on the second degree murder and witness tampering counts; new trials are ordered for the separate individual charges against Grey Bear (perjury and witness tampering), Fox (perjury), and Jesse Cavanaugh (witness tampering); the conviction of Maynard Dunn for assault resulting in serious bodily injury is dismissed due to lack of sufficient evidence; the convictions for second degree murder

---

**13.** Judge Harvey Johnsen cogently addressed the question of harmless error in a criminal trial several years ago. He observed:

Errors of the trial court which may be prejudicial in a close criminal case, in the sense of being capable in such a situation of possibly affecting the result, can well be without any

such rational possibility in a strong case, and thus not entitle the defendant to a reversal of his conviction.

*Homan v. United States,* 279 F.2d 767, 771 (8th Cir.), *cert. denied,* 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960).

of Jesse and Paul Cavanaugh, Loren Grey Bear, Terry Dunn, Tim Longie, Leonard Fox, and Roger and Dwayne Charboneau are dismissed due to a lack of sufficient evidence. In view of our holding, it is not necessary to pass on the various other issues raised by the defendants. Because all defendants are presently incarcerated, we order our mandate to issue forthwith.