**David Lee ROTHGEB, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 85–1556.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1985.

Decided April 30, 1986.

Rehearing and Rehearing En Banc Denied June 25, 1986.

Gary L. Stamper, Columbia, Mo., for appellant.

Dean R. Hoag, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

HENLEY, Senior Circuit Judge.

David Lee Rothgeb was found guilty of the murders of his wife and daughter, in violation of 18 U.S.C. § 1111. The murders occurred while the family was on a canoe trip in the Ozark National Scenic Riverways.[1] He was sentenced to life imprisonment for the first degree murder of his wife, April Rothgeb, and was sentenced to two hundred ten years imprisonment for the second degree murder of his daughter, Windy Rothgeb. Rothgeb appeals his jury convictions arguing that the evidence was insufficient to convict him, that the trial court[2] erred in admitting prejudicial evidence, and that the sentence of two hundred ten years imprisonment for second degree murder is outside the statutory limits. We affirm.

Rothgeb first argues that the trial court erred in denying his motions for acquittal, which were submitted at the close of all the evidence and after the jury verdict was returned. In reviewing an appeal from a jury verdict for insufficiency of the evidence, we view the evidence in the light most favorable to the government and give it the benefit of all reasonable inferences that may logically be drawn from the evidence. *United States v. Netz*, 758 F.2d 1308, 1310 (8th Cir.1985). The jury's verdict will be overturned only if the evidence is such that a reasonable minded jury *must* have a reasonable doubt as to the existence of one of the essential elements of the crime. *Id.*

Rothgeb argues that the evidence was insufficient to support his conviction because the government failed to prove that the deaths were a result of murder, and not

---

1. In the Riverways area, the United States has concurrent jurisdiction with the State of Missouri.

2. The Honorable H. Kenneth Wangelin, United States Senior District Judge, Eastern District of Missouri.

accidental drownings, and that, if a crime was committed, he did it. The government argued that Rothgeb planned the murder of his wife so he could collect insurance money and go live with his lover, taking his daughter with him. The government theorized that the murder of Windy was not planned, but that Windy saw the murder of her mother and that Rothgeb then killed her as well.

We forego as unnecessary detailed discussion of the evidence but briefly sketch the main facts.

The family started the float trip down the Upper Jacks Fork River Saturday morning, June 16, 1984. There was evidence that April and Windy did not want to go on the float trip, but that Rothgeb insisted on the trip. According to Rothgeb's testimony, the family floated down the river until about three o'clock in the afternoon. They then stopped and set up camp on a gravel bar across from the Dark Hollow Hole, a swimming hole which was about eight to ten feet deep. The family swam for a while, ate dinner, and then went for another swim. Both Windy and April were good swimmers. The women then decided to change out of their swimsuits. Windy, who was fifteen years old, was embarrassed to change her clothes in front of her father. He stated that she could not change in the tent because a cat had urinated in the tent and it smelled terrible. He went upstream to get some firewood while Windy and April changed clothes. When he returned the women were gone. He noticed that their swimsuits were hanging on a line. He changed his clothes and then waited for the women to return. After a while he walked downstream a short distance looking for them, calling their names and shouting. He returned when it was getting dark. He then built up the fire in case they returned, and around 9:00 o'clock walked upstream three-fourths of a mile to the Bunker Hill Camp. He arrived there around midnight and obtained help.

Park rangers started searching that night for the two women. When they came to the camp in the early hours of the morning they found only one swimsuit on the line; April's swimsuit was found in the grub box on top of her husband's swimsuit. The camp site was not in disarray, and there was no appearance of a struggle having taken place. No footprints were found outside a fifty yard radius on the gravel bar. No footprints were found on a gravel bar where Rothgeb told the officers he had walked when looking for his wife and child. No ranger who entered the tent smelled cat urine there. Five men, camping approximately one-fourth of a mile below the Rothgeb campsite, said they neither saw Rothgeb nor heard him calling for his wife and child that evening. There was evidence that it usually takes one-half hour in daylight to walk from the Rothgeb campsite to Bunker Hill; it took Rothgeb three hours that night.

It was not until the following morning that the bodies of April and Windy, fully clothed, were found. April's body was found three-fourths of a mile downstream from the Rothgeb camp, caught on a rootwad. About two hundred fifty—three hundred yards downstream from the Rothgeb camp the body of Windy was found in an eddy, out of the mainflow of the river. Windy's glasses were found in water twenty-four inches deep, approximately twenty-five yards downstream from the family camp.[3] The bodies of both women had various cuts, scrapes and bruises, the causes of which were disputed at trial. Both women died by drowning, but it could not be determined whether they were con-

---

**3.** Both parties appear to agree that Windy drowned in the area where her glasses came off. The government argued that her father drowned her here. Rothgeb suggested in his brief that Windy tried to save her mother from an accidental drowning here, but was overcome by her mother's superior size and strength. At other times, Rothgeb has suggested that the five men camped below the family campsite had something to do with the deaths of his wife and daughter. Rothgeb, of course, has no duty to explain what happened; the burden of proof is on the government.

scious at the time they drowned. Neither woman had been sexually assaulted.

Rothgeb testified that he and April had discussed getting a divorce; however, with the exception of one of his friends, no one else, including April's parents and friends, was aware that there were any marital problems or plans for a divorce. Rothgeb had a lover, Kitty Eldridge, who lived in North Carolina. He had met her in November, 1983, approximately seven months before the murders occurred. He had communicated with her frequently and had visited her on two occasions. The second visit was during the last week of May, two and one-half weeks before the murders. The day before the float trip Rothgeb talked with Kitty four different times on the telephone.

The evidence showed that Kitty had the impression from Rothgeb that the float trip was to be the last family trip before the divorce, and she had told a friend that Windy and Rothgeb were coming to live with her in North Carolina. Rothgeb's letters to Kitty also suggested that he and Windy were going to move to North Carolina and live with Kitty. It was not likely that Rothgeb could have easily gotten custody of his daughter. Windy was April's only child, and April had had a tubal ligation and could not have any more children.

On April 24, 1984, less than two months before her murder, a $100,000.00 insurance policy was purchased on April's life. Before 1984 the Rothgebs had no insurance on April's life other than a $3,000.00 policy through Rothgeb's employer. No mention was made to the insurance salesman of any plans for divorce. David Rothgeb was the primary beneficiary of this policy. Within days of his wife's death he had contacted the insurance company.

As indicated, we have set out only some of the facts involved in this case. We have not set out all of the inconsistencies in Rothgeb's story, the conflicting statements he made to various people, the experts' opinions as to how the women incurred the injuries found on their bodies, and the oth-er circumstantial evidence which supports a finding of guilt.

■ Rothgeb argues that there were two equally reasonable inferences, one of guilt and one of innocence, and therefore the jury must have had a reasonable doubt. We disagree that there were two equally reasonable inferences. The jury's verdict was supported by substantial evidence, and we do not believe that the jury *must* have had a reasonable doubt of Rothgeb's guilt. The government did not have to prove Rothgeb's guilt beyond any possible doubt, only beyond reasonable doubt. The trial court did not err in denying the motions for acquittal.

■ Rothgeb next argues that the trial court erred in admitting the testimony of Trooper Horst. The trial court has broad discretion in determining what evidence can be admitted, and its decision will be overturned on appeal only if there was an abuse of discretion. *United States v. Swarek,* 656 F.2d 331, 337 (8th Cir.), *cert. denied,* 454 U.S. 1034, 102 S.Ct. 573, 70 L.Ed.2d 478 (1981). Trooper Horst was present when Rothgeb took a polygraph examination and was asked three times, in slightly different context, whether he had killed his wife and child. At trial, no mention was made of this polygraph examination. Horst testified only that he was present during an interrogation when Rothgeb was asked the questions, and that he observed that for each question Rothgeb would hold his breath for five to fifteen seconds, reply no, and then pant like a dog. He also stated that Rothgeb sweated profusely during the questioning.

■ Rothgeb argues that the probative value of the testimony was outweighed by the unfair prejudicial effect. *See* Fed.R. Evid. 403. He argues that the government offered the evidence to prove consciousness of guilt, but that the evidence did not support an inference of guilt and therefore it should not have been admitted. He compares the evidence of his demeanor to evidence of flight from the scene of the crime. *See United States v. Myers,* 550 F.2d 1036,

1049 (5th Cir.1977) (flight evidence is generally viewed as an admission by conduct which gives rise to a consciousness of guilt. It should be admitted only if an inference of consciousness of guilt can be fairly made from evidence). One's demeanor during questioning is not necessarily comparable to the prejudicial effect created by evidence of flight. Heavy breathing and sweating during an interrogation are not admissions, and we do not believe the conduct necessarily creates an inference of consciousness of guilt.[4] An innocent person might be shocked, appalled and upset if he was questioned whether he had murdered his family, and he might react in exactly the same way. The jury may or may not have believed that Rothgeb's reactions indicated that he was lying. There was no per se unfair prejudicial effect.

▆▆ Rothgeb also argues that the evidence should not have been admitted since his demeanor during questioning is less probative than an outright refusal to take a polygraph test, yet a refusal is not admissible evidence. Although the results of a polygraph examination and a refusal to take a polygraph may not be admissible, the responses to questions asked during the polygraph are admissible evidence. See Wyrick v. Fields, 459 U.S. 42, 48 n. *, 103 S.Ct. 394, 396 n. * 74 L.Ed.2d 214 (1982). We believe that evidence concerning a defendant's demeanor during the questioning is also admissible, particularly when there is no mention that the questioning occurred during a polygraph examination.

▆▆ Finally, Rothgeb argues, for the first time, that the evidence should not have been admitted because the testimony was false and he had no way to impeach Horst's credibility without bringing in evidence about the polygraph. The evidence that Rothgeb cites does not fully support this allegation, and it does not support a demand for a new trial. We are not persuaded that the district court abused its discretion in admitting Horst's testimony. Moreover, if there was error in admitting the evidence, it was harmless beyond a reasonable doubt. Rothgeb's demeanor during this questioning appears to have been an insignificant part of the government's case, which, though largely circumstantial, was very strong indeed.

The last issue raised by Rothgeb concerns the legality of his sentence. For the first degree murder Rothgeb was sentenced to life imprisonment, and he will be eligible for parole consideration after ten years. See 18 U.S.C. §§ 1111(b), 4205(a). For the second degree murder he was sentenced to two hundred ten years imprisonment under 18 U.S.C. § 1111(b). The trial court held that Rothgeb will not be eligible for parole consideration until he has served sixty-nine years of the sentence. See 18 U.S.C. § 4205(b)(1). The two sentences are to run consecutively.[5] Rothgeb argues that his sentence for second degree murder is outside the statutory limit because Congress intended to place life imprisonment as the penalty ceiling for second degree murder under § 1111(b), and because the court could not postpone his parole eligibility date past the ten years provided in § 4205(a).

▆▆ Section 1111(b) allows the court to impose "any term of years or life imprisonment" for second degree murder. The language of the statute is unambiguous. "Any term of years" means just what it states; there is no limit on the years the court can impose. To hold otherwise makes the use of the words "any" and "or"

---

**4.** The government wanted to present evidence that Rothgeb was deliberately attempting to thwart the results of the polygraph examination by irregular breathing patterns. Had the court allowed this, Rothgeb's claim that his demeanor was used to prove consciousness of guilt might be more persuasive, and we might have been inclined to agree that the prejudicial effect outweighed the probative value. However, the trial court did not allow this and evidence of the polygraph examination itself was never admitted into evidence.

**5.** ˌ Rothgeb has not raised the issue of whether a sentence for a term of years can run consecutively to a life sentence, and therefore we need not discuss it.

superfluous. If Congress had intended that there be a limit on the number of years it could have so stated. *See Giblin v. United States,* 523 F.2d 42, 45 (8th Cir. 1975), *cert. denied,* 424 U.S. 971, 96 S.Ct. 1470, 47 L.Ed.2d 739 (1976) (sentence of one hundred years for kidnapping was not outside the statutory limits since the statute, 18 U.S.C. § 1201, provided for "imprisonment for any terms of years or for life." *United States v. O'Driscoll,* 761 F.2d 589, 597–98 (10th Cir.1985) (federal kidnapping statute, which provides for "imprisonment for any term of years or for life," permits a sentence of three hundred years). The sentence of two hundred ten years was within the statutory limits.

Section 4205(a) provides that "a prisoner shall be eligible for release on parole after serving one-third of such term or terms or after serving ten years of a life sentence or of a sentence of over thirty years, except to the extent otherwise provided by law." If this was the only applicable statute, then Rothgeb would be eligible for parole consideration in ten years for both the first degree murder and the second degree murder sentence. However § 4205(b) creates an exception to § 4205(a). Section 4205(b) provides that when "the ends of justice and the best interest of the public require that the defendant be sentenced to imprisonment for a term exceeding one year," the court "may (1) designate in the sentence of imprisonment imposed a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court...."

Rothgeb argues that § 4205(b)(1) does not permit the court to extend the eligibility date for parole beyond the ten years provided in § 4205(a); it allows only for an earlier release. Although the statute clearly and unambiguously provides that the court may require that the defendant serve up to one-third of the maximum sentence imposed, he argues that this was not the intent of Congress. He believes that the legislative history indicates that the purpose of subsection (b) was to permit only earlier parole releases. *See* S.Rep. No. 2013, 85th Cong., 2d Sess. 2, *reprinted in* 1958 U.S.Code Cong. & Ad.News 3891.

The starting point for construing a statute is the language of the statute itself. *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Unless there is a clearly expressed legislative intention to the contrary, the language of the statute must ordinarily be regarded as conclusive. *Id.* Here, the issue of whether the court could postpone the parole eligibility date was not directly addressed in the legislative history, and there are only vague references as to the intent of Congress. Arguments as to the general intent of the Congress cannot overturn the specific language of the statute.

The trial court is permitted to require that a defendant serve longer than ten years before he is eligible for parole when it is in the interest of justice. *See O'Driscoll,* 761 F.2d at 596 (affirmed sentence that defendant was not eligible for parole under 18 U.S.C. § 4205(b)(1) until he served ninety-nine years of a three hundred year sentence); *United States v. Young-Buffalo,* 705 F.2d 468 (9th Cir.1983) (unpublished opinion) (sentence requiring the defendant serve one-third of his ninety-nine year sentence, under 18 U.S.C. § 4205(b)(1), was lawful), *cert denied,* 464 U.S. 1071, 104 S.Ct. 979, 79 L.Ed.2d 217 (1984); *but see United States v. Fountain,* 768 F.2d 790, 799 (7th Cir.) (in dicta the court stated that the apparent purpose of § 4205(b)(1) is to allow earlier eligibility for parole, not to extend the date), *modified,* 777 F.2d 345 (7th Cir.1985).

There is, of course, the possibility that Rothgeb will never be granted parole on his life sentence. Even so, it is at least arguable that in a sense the sentencing result here may be anomalous in that Rothgeb must serve a longer time before parole eligibility for the lesser crime than for the greater crime. However, the sentence of sixty-nine years before parole eligibility is authorized by statute, and we are not inclined to upset it. In coming to this

conclusion, we recognize that the sentence is an extremely long one and we wish to emphasize that our decision here is without prejudice to the right of Rothgeb to seek reduction of sentence in the district court under the provisions of Fed.R.Crim.P. 35(b).

From what has been said, it follows that the judgments of the district court convicting and sentencing appellant should be, and they are, affirmed.

LAY, Chief Judge, concurring and dissenting.

I concur in the majority's affirmance of the judgment of conviction.

I write separately to dissent from the majority's approval of the district court's erroneous ruling that (1) a sentence of 210 years imprisonment for a second degree murder conviction lies within the applicable statutory limits of 18 U.S.C. § 1111(b) and (2) such a sentence can operate to postpone the defendant's parole eligibility date decades past the time specified by Congress. Both decisions are in direct conflict with decisions of this court.[1]

There are two fundamental errors in the majority's analysis. First, in interpreting § 1111(b) the majority fails to analyze the statutory structure in which Congress prescribed the penalties for first and second degree murder. The analomy created by the majority's reasoning is that it approves a greater sentence for second degree murder than for the more heinous crime of first degree murder. This holding is not only contrary to the law of this circuit but contradicts a common sense application of the statute as well. Second, the majority misreads the parole eligibility requirements specified by Congress in 18 U.S.C. § 4205 and contradicts the precedent of this circuit by improperly attempting to overrule this court's prior constructions of that statute. *See, e.g., Edwards v. United States,* 574 F.2d 937 (8th Cir.), *cert. dismissed,* 439

U.S. 1040, 99 S.Ct. 643, 58 L.Ed.2d 700 (1978).

**The sentence**

The federal murder statute reads in full:

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabatoge, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto "without capital punishment", in which event he shall be sentenced to imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

18 U.S.C.A. § 1111 (West 1984 & Supp. 1986).

In view of the Supreme Court's abolition of the death penalty for federal crimes, *see Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the penalty for first degree murder under § 1111(b) is limited to life imprisonment. For murder not falling within the definition of first degree murder, the penalty is "for any term of years or for life." With all due respect for the majority's attention to determining the intent of Congress from the statute's literal language, I feel that it is rationally in-

---

1. A panel of this court, like a district court, is bound by prior Eighth Circuit decisions until those cases are overruled by this court sitting en banc. *See, e.g., Yates v. United States,* 753 F.2d 70, 71 (8th Cir.) (per curiam) (citations omitted), *cert. denied,* — U.S. —, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985).

complete when considering legislative intent to fail to analyze the entire statutory scheme of sentencing for murder.

In interpreting the federal murder statute, § 1111(b)'s place in the statutory scheme is better understood by comparing the present language to the previous version of subsection (b). Before amendment in 1948, the statute stated that the sentence for second-degree murder may be "not less than ten years and may be imprisoned for life." The 1948 amendment changed that phrase to "any term of years or life," *not to allow a greater penalty*, but to conform to a uniform policy of omitting the minimum punishment. *See* Revisor's Note, 18 U.S.C.A. § 1111 (1984). Moreover, the majority's reasoning attempts to overrule the recognition by this court and others that life imprisonment is the *maximum* penalty for second degree murder. *United States v. Black Elk*, 579 F.2d 49, 51 (8th Cir.1978) (per curiam) (emphasis added). *Cf. United States v. Means*, 575 F.Supp. 1068, 1072 (D.S.D.1983) (if juvenile offender was convicted and sentenced for second degree murder as an adult, "he would face a maximum penalty of life imprisonment.") Under the majority's interpretation, however, though the ceiling for punishing first degree murder is life imprisonment, for a second degree murder conviction there is no statutory limit on the length of punishment the individual can be compelled to serve.

At common law, the mandatory death penalty was the exclusive and specific sentence imposed on all convicted murderers, regardless of the underlying facts and circumstances surrounding the offense. *See Gregg v. Georgia*, 428 U.S. 153, 176–77, 96 S.Ct. 2909, 2926–27, 49 L.Ed.2d 859 (1976), (citations omitted). To alleviate the harshness of this rule, legislatures, beginning with the Pennsylvania legislature in 1794, divided murder into statutory degrees and "confine[d] the mandatory death penalty to 'murder of the first degree' encompassing all 'wilful, deliberate and premeditated' killings."[2] *Woodson v. North Carolina*, 428 U.S. 280, 290, 96 S.Ct. 2978, 2984, 49 L.Ed.2d 944 (1976). This recognition that there is a distinction in the degree of culpability among murderers is preserved in 18 U.S.C. § 1111. As the Supreme Court has recognized:

> it has long been a "familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intent of its makers." * * * To read a substantial change in accepted practice into a revision of the Criminal Code without any support in the legislative history of that revision is insupportable. * * * "It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such an intention be clearly expressed."

*Muniz v. Hoffman, Regional Director, National Labor Relations*, 422 U.S. 454, 469–70, 95 S.Ct. 2178, 2186–87, 45 L.Ed.2d 319 (1975) (citations omitted). Thus, the majority ignores the fundamental rule that when construing a criminal statute and its words are capable of two constructions, that construction more favorable to the accused shall prevail. *See United States v. Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973). Surely, in light of historical tradition and Congressional intent as expressed in the legislative history and statutory language, Congress never intended that a greater penalty could be meted out for second degree murder than for murder in the first degree.[3]

---

2. The preamble to the 1794 Pennsylvania statute stated: "And whereas the several offenses, which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness, that it is unjust to involve them in the same punishment." Pa.Laws of 1794 ch. 257, §§ 1, 2 (1794) (quoted in Model Penal Code § 210.2 n. 15 (1980)).

3. This court's recent decision, *Stevens v. Armontrout*, 787 F.2d 1282 (8th Cir.1986), is not inconsistent with this analysis. In *Stevens*, this court considered a 200 year sentence imposed for second degree murder under a statute worded similarly to 18 U.S.C. § 1111 and found that the sentence did not constitute cruel and unusual punishment in violation of the eighth and fourteenth amendments. As was noted in that opin-

Further, the majority's reliance on kidnapping cases, *see United States v. O'Driscoll*, 761 F.2d 589, 597–98 (10th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986); *Giblin v. United States*, 523 F.2d 42, 45 (8th Cir.1975), *cert. denied*, 424 U.S. 971, 96 S.Ct. 1470, 47 L.Ed.2d 739 (1976), to support its interpretation of § 1111(b)'s language is misplaced. The kidnapping statute which the above cases construe is not structured into degrees of punishment as is the crime of murder. *See* 18 U.S.C. § 1201; *see also United States v. Fountain*, 777 F.2d 345, 346 (7th Cir.1985).

**Parole eligibility**

The anomaly is heightened when one considers that a person convicted of first or second degree murder and sentenced to life or of any term of years is still automatically eligible for parole after ten years. 18 U.S.C. § 4205(a).[4] *See Edwards v. United States*, 574 F.2d at 947 n. 2 ("Under the present law a prisoner serving a life sentence or a sentence of more than thirty years is eligible for parole consideration after the expiration of ten years.") (Henley, J., concurring with Bright, J.; Stephenson, J. dissenting on different grounds). *See also United States v. Fountain*, 768 F.2d 790, 799 (7th Cir.1985) (citing U.S. Dept. of Justice, U.S. Parole Commission, Rules and Procedures Manual § 2.5 (Oct. 1, 1984); U.S. Dept. of Justice, Federal Prison System, Program Statement No. 5050.9, at p. 2 (May 21, 1979). *But see O'Driscoll*, 761 F.2d at 598. Thus, to sentence a defendant for more than a 30 year term for any crime does not serve the purpose of deferring parole eligibility. Notwithstanding the fact that Rothgeb's sentence for 210 years is to run consecutively with his life sentence, contrary to the district court's ruling under § 4205(a) and consistent with the law of this circuit he should still be considered eligible for parole within 10 years.

I agree with the Seventh Circuit that the apparent purpose of the exception to § 4205(a) created in § 4205(b) is to allow release on parole before the earliest date allowed by subsection (a). *See, Fountain*, 768 F.2d at 799. The Tenth Circuit's contrary construction of § 4205 in *O'Driscoll* ignores the overwhelming recognition that § 4205(b)'s purpose was to provide an offender the opportunity for *early* release, if deemed appropriate. *See, e.g., Edwards*, 574 F.2d at 941; *Fountain*, 768 F.2d at 799; *United States v. Busic*, 592 F.2d 13, 26 (2d Cir.1978) ("[A] reading of § 4205 as a whole indicates that Congress meant to vest the sentencing court with authority under § 4205(b) to designate that a person subject to a life sentence be eligible for parole earlier than the ten year maximum prescribed by § 4205(a).")

It is axiomatic that courts should endeavor to give statutory language that meaning which nutures the policies underlying the legislation. *United States v. Sisson*, 399

---

ion, however, Missouri law imposes the death penalty for murder in the first degree. We are not presented here with the constitutional issue resolved by this court in *Stevens*. Compared to death, a sentence for a term of years is lesser punishment than that imposed for first degree murder and is consistent with the intent of the Missouri legislature. Moreover, the relevant Missouri parole statutes provide that prisoners serving life sentences or longer terms of years are eligible for parole after having served twelve years. *See Stevens*, 787 F.2d at pp. 1283–1284 (citations omitted).

**4.** 18 U.S.C. § 4205 states, in full:
(a) Whenever confined and serving a definite term or terms of more than one year, a prisoner shall be eligible for release on parole after serving one-third of such term or terms or after serving ten years of a life sentence or of a sentence of over thirty years, except to the extent otherwise provided by law.
(b) Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interest of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may
(1) designate in the sentence of imprisonment imposed a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court, or
(2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may be released on parole at such time as the Commission may determine.

U.S. 267, 297, 90 S.Ct. 2117, 2133, 26 L.Ed.2d 608 (1970) (construing Criminal Appeals Act). It passes common understanding to find that Congress intended that the lesser offense of second degree murder could carry a sentence of double or treble the maximum that may be imposed for the greater offense of murder in the first degree. I agree that there exists the possibility that Rothgeb will never be granted parole. However, the time limits governing his eligibility for parole are expressly established by statute. To the extent the majority affirms a district court's attempt to circumvent that language, I must dissent.