The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
August 8, 2019

## 2019COA124

**No. 16CA0076, *People v. Thames* — Constitutional Law — Fifth
Amendment — Fourteenth Amendment — Presumption of
Innocence; Evidence — Exclusion of Relevant Evidence on
Grounds of Prejudice, Confusion, or Waste of Time**

This is the first reported Colorado decision that addresses
whether a trial court violates a defendant's right to be presumed
innocent when it permits the prosecution to show the jury a video of
the defendant wearing a prison uniform.  A division of the court of
appeals concludes that the presumption of innocence was not
violated in this instance.  In reaching this conclusion, the division
relies on cases from other jurisdictions holding that the risk of
prejudicing the defendant due to his clothing is not present when
the jury is shown a video depicting the defendant in a prison
uniform.

COLORADO COURT OF APPEALS                                    2019COA124

Court of Appeals No. 16CA0076
Mesa County District Court No. 12CR517
Honorable Richard T. Gurley, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Douglas Thames,

Defendant-Appellant.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE LIPINSKY
Román and J. Jones, JJ., concur

Announced August 8, 2019

Philip J. Weiser, Attorney General, Brian M. Lanni, Assistant Attorney General,
Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Alan M. Kratz, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Douglas Thames, was the second person convicted for the sexual assault and murder of J.T.  Nineteen years earlier, a jury had convicted Robert Dewey for the same crimes.  The prosecution's case against Dewey had included testimony that his DNA could have been present at the site of the murder.  Because of the state of DNA testing at the time, however, those test results did not indicate the likelihood that the DNA recovered at the crime scene matched that of Dewey.

¶ 2     Fifteen years after Dewey's conviction, DNA testing using an improved technology known as STR (Short Tandem Repeat) revealed that Thames's DNA was present on objects found at the crime scene and under J.T.'s fingernails.  The STR tests showed there was only a one in seven sextillion chance that the match to Thames was random.

¶ 3     As a result of the new DNA tests, Dewey was exonerated and released from prison.  The same tests led to the filing of charges against Thames.  A jury convicted Thames of first degree murder after deliberation, first degree felony murder, and first degree sexual assault.

¶ 4     Thames contends on appeal that the trial court erred in not allowing him to introduce evidence of Dewey's conviction or the DNA test results (the Results) presented at Dewey's trial. Thames also contends that the trial court erred in permitting the prosecutor to comment on his silence during a video-recorded interrogation (the Interrogation). He further contends that the trial court should not have permitted the jury to view the video of the Interrogation because it showed him wearing prison garb. Thames also argues that the cumulative effect of these errors requires reversal. Lastly, he argues that the trial court violated his right to be free from double jeopardy by imposing mandatory statutory surcharges and costs (the Surcharges) outside his presence after sentencing.

¶ 5     We affirm but remand with instructions to allow Thames the opportunity to argue that he is entitled to a statutory waiver of the Surcharges.

## I.     Facts and Procedural History

¶ 6     A neighbor discovered J.T.'s body in the bathtub of her apartment. J.T. had been beaten, sexually assaulted, and strangled to death with a dog leash. Pieces of soap had been inserted into her vagina.

¶ 7    Dewey was an initial suspect.  Police arrested him after DNA testing revealed the possibility that J.T.'s blood was on one of his shirts.  As noted, a jury convicted Dewey for J.T.'s sexual assault and murder in 1996.

¶ 8    In 2011, new DNA testing exonerated Dewey.  The testing revealed the presence of Thames's DNA on the leash and underneath J.T.'s fingernails, among other locations.

¶ 9    After reviewing the new DNA results, law enforcement officers interrogated Thames regarding the murder of J.T.  At the time of the Interrogation, Thames was incarcerated for an unrelated offense.  The People then charged Thames with first degree murder after deliberation, first degree felony murder, and first degree sexual assault.

¶ 10   Thames challenged the admissibility of his statements during the Interrogation on the grounds that he had not knowingly and intelligently waived his right against self-incrimination.  The trial court granted Thames's motion to suppress his statements.  The Colorado Supreme Court reversed.  *People v. Thames*, 2015 CO 18, ¶¶ 27-28, 344 P.3d 891, 898.

¶ 11    At trial, Thames pursued an alternative suspect defense, arguing that Dewey had sexually assaulted and killed J.T.  (Thames presented evidence that other individuals may also have committed the crimes.  Evidence concerning those alternative suspects is irrelevant to this appeal.)  After a four-week trial, the jury found Thames guilty on all counts.

¶ 12    On the murder counts, the trial court sentenced Thames to a term of life imprisonment in the custody of the Department of Corrections without the possibility of parole.  The court further sentenced him to forty-eight years imprisonment on the sexual assault count.  The court did not impose any surcharges or costs at the sentencing hearing.

### II.    The Trial Court Did Not Abuse Its Discretion by Refusing to Admit Evidence of Dewey's Conviction

¶ 13    Thames contends that the trial court violated his constitutional right to present a defense by refusing to admit evidence that a jury had previously convicted Dewey of the same crimes with which Thames was charged.  We discern no error.

## A. Standard of Review

¶ 14    We review a trial court's ruling on evidentiary issues, including the admission of alternative suspect evidence, for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002). A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or is based on an erroneous view of the law. *People v. Elmarr*, 2015 CO 53, ¶ 20, 351 P.3d 431, 438.

## B. Law Governing Admission of Alternative Suspect Evidence

¶ 15    "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citations omitted); *see also People v. Salazar*, 2012 CO 20, ¶ 17, 272 P.3d 1067, 1071. A criminal defendant is entitled to all reasonable opportunities to present evidence that might tend to create doubt as to his guilt. *Elmarr*, ¶ 26, 351 P.3d at 438.

¶ 16    However, the right to present a defense is generally subject to, and constrained by, familiar and well-established limits on the admissibility of evidence. *Id.* at ¶ 27, 351 P.3d at 438. The

admissibility of alternative suspect evidence depends on the strength of the connection between the alternative suspect and the charged crime. *Id.* at ¶ 22, 351 P.3d at 438.

¶ 17    To be admissible, alternative suspect evidence must be relevant under CRE 401 and its probative value must not be substantially outweighed by the danger of confusion of the issues or misleading the jury, or by considerations of undue delay under CRE 403. *Elmarr,* ¶ 22, 351 P.3d at 438. But a defendant does not have the right to "present all the evidence he wishes or do so in the manner he chooses." *People v. Saiz,* 32 P.3d 441, 449 (Colo. 2001) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)).

> A trial court retains the discretion to assess the incremental probative value of evidence offered by a criminal defendant and to exclude even logically relevant evidence that would be more wasteful of time, confusing, or misleading than helpful to the jury. . . . [I]t may not abdicate its responsibility to guard against prejudice and promote judicial efficiency by excluding evidence that is insufficiently probative to assist in the search for truth.

*Id.*

### C. The Trial Court Did Not Abuse Its Discretion by Limiting the Evidence Implicating Dewey as an Alternative Suspect

¶ 18     To support his argument that the trial court should have admitted evidence of Dewey's conviction, Thames relies on the reasoning in *Gore v. State*, 119 P.3d 1268 (Okla. Crim. App. 2005). There, the Oklahoma Court of Criminal Appeals held that the defendant was entitled to present evidence that another individual, Williamson, had been convicted of the same murder for which the defendant was later charged. *Id.* at 1276. The appellate court reasoned that the evidence — which included Williamson's statement that he had dreamed of killing the victim, testimony by law enforcement officers and inmates who overheard Williamson admit to the crime, and statements by individuals that the victim had said Williamson had asked her out but she did not want to date him — was relevant in that it bore on the defendant's guilt or innocence. *Id.* The court held that, by excluding this evidence, the trial court had deprived the defendant of his constitutional right to present a defense. *Id.* at 1277.

¶ 19    *Gore*, however, is distinguishable.  In this case, the trial court allowed Thames to present evidence pointing to Dewey as an alternative suspect.

¶ 20    The trial court at first excluded evidence of Dewey's trial and conviction.  But, in the initial part of the trial, the court allowed Thames to present other evidence that Dewey had sexually assaulted and murdered J.T., including the following:

- Dewey spent a significant amount of time at J.T.'s apartment before she died.

- After J.T. kicked Dewey out of her apartment, Dewey said he was "going to get" J.T.

- Dewey stayed in an apartment near J.T.'s on the night J.T. was sexually assaulted and murdered, but left that apartment in the middle of the night.

- Dewey hid in a closet after police arrived at his apartment complex on the morning J.T.'s body was discovered.

After the jury had heard this evidence, the court reversed itself and ruled that the prosecution had opened the door to the introduction of evidence of Dewey's trial.  Thames contends that, although the

jury heard substantial evidence suggesting that Dewey was the murderer, the trial court erred by not permitting him to tell the jury that Dewey had been convicted of the crimes.

¶ 21    While evidence of Dewey's conviction may have been relevant because it provided a strong logical connection between Dewey and the sexual assault and murder of J.T., we conclude that the trial court did not abuse its discretion in refusing to admit evidence of the conviction under CRE 403. *Saiz*, 32 P.3d at 446, 449. Unlike the defendant in *Gore*, Thames was able to implicate Dewey in the crimes by repeatedly emphasizing Dewey's behavior both before and after the discovery of J.T.'s body. And, as the trial court held, any probative value of Dewey's conviction was substantially outweighed by the danger that the jury would have "speculate[d] about why a different jury convicted Mr. Dewey" and conflated the issues between Dewey's trial and Thames's trial.

¶ 22    Further, introducing evidence of the conviction would have extended Thames's trial. CRE 403; *see Elmarr*, ¶ 31, 351 P.3d at 439 (court must weigh probative value of alternative suspect evidence against danger of undue delay). After Thames presented evidence of Dewey's conviction, the People would have had an

9

opportunity to introduce evidence of Dewey's exoneration. This evidence could have involved extensive testimony regarding the advances in DNA technology between the time of Dewey's trial and his exoneration.

¶ 23 Thus, we conclude that the trial court did not abuse its discretion in excluding evidence of Dewey's conviction. (Because we resolve this issue under CRE 403, we need not address the unbriefed question of whether, under section 13-65-103(7)(a), C.R.S. 2018, Dewey's conviction became a legal nullity upon his exoneration and, therefore, was not a past conviction. Our opinion should not be read as holding that an expunged conviction has, or does not have, legal significance.)

III.  The Prosecutor Commented on Thames's Demeanor While Answering Questions During the Interrogation and Not on His Silence

¶ 24 Thames next contends that, in closing argument, the prosecutor improperly commented on his silence during the Interrogation. We do not agree because the prosecution commented on the manner in which Thames answered the officers' questions during the Interrogation, and not on Thames's failure to speak.

## A. Standard of Review

¶ 25    We review de novo whether the prosecutor impermissibly commented on a defendant's right to remain silent. *See People v. Ortega*, 2015 COA 38, ¶ 8, 370 P.3d 181, 184 ("'[W]here constitutional rights are concerned,' law application 'is a matter for de novo appellate review.'" (quoting *People v. Matheny*, 46 P.3d 453, 462 (Colo. 2002))).

## B. The Prosecution's Closing Argument

¶ 26    During closing arguments, the prosecutor played clips from the video of the Interrogation, which the jury had seen during the trial. The prosecutor reminded the jury that the officers had not told Thames in advance why they were there and asked the jurors to "judge [Thames's] statements in that context."

¶ 27    The prosecutor said that, in the video, "[Thames] has a total lack of reaction to being accused of [J.T.'s] murder," and that the jurors "can judge it" for themselves. The prosecutor then said,

> I say it's a total lack of reaction. No real emotion, no anger. Hey, why are you accusing me of this? What would an innocent person say when confronted with another persons' [sic] murder?

11

It would be outrage. It would be defiant [sic]. They would be screaming to the heavens I'm innocent. How can you accuse me of this? He wasn't. No indignation, no surprise. No surprise that they're accusing him of murder.

It says yeah, he's been waiting 18 years for this interview to happen. That's the only way you can explain it. No connection to J.T. and yet he remembers the night 18 years later.

We've been over this. He's accused of murder and yet he shows no surprise and/or indignity.

Defense counsel moved for a mistrial, asserting that these comments violated Thames's right to remain silent. The trial court denied the motion.

¶ 28    The prosecutor then played additional clips of the Interrogation. The prosecutor argued that Thames's reaction to the officer's questions whether he had any remorse about J.T.'s murder was "[n]o indignation, no surprise, no hostility, no anger . . . ."

¶ 29    After playing another clip, the prosecutor said,

He's confronted with all these pieces of DNA being at the crime scene and he's just nodding. He's given out to say yeah, I was having a relationship with her.

That's why my DNA is over there. They were begging him to give them something else. Some other reason not to think he's the murderer and he doesn't give it to them.

12

> In fact, his reaction again is not consistent with anything close to being a normal reaction. It is very abnormal and we would submit it is indicative of his guilt.
>
> He is trying to be too cool about being confronted with this. He doesn't know how to react. A normal reaction is one of anger, frustration, surprise, shock.
>
> You can name the adjective he doesn't give us because he's calculating what he should be reacting, and he doesn't want to show too much. You can draw your own inferences from this, but this is a very abnormal reaction.

¶ 30    After the prosecutor's closing argument, defense counsel renewed the earlier motion for a mistrial. The court again denied the motion.

C.    Law Governing Comments on a Defendant's Demeanor

¶ 31    A defendant is constitutionally protected against self-incrimination and has the right to remain silent. *People v. Herr*, 868 P.2d 1121, 1124 (Colo. App. 1993). Accordingly, a prosecutor may not allude to a defendant's silence as indicating a consciousness of guilt. *People v. Ortega*, 198 Colo. 179, 182, 597 P.2d 1034, 1036 (1979) (finding prosecutor's comment that "defendant's statement to the Sheriff didn't include a protestation of

13

innocence" was reversible error).  Such a comment "effectively penalizes the defendant for exercising a constitutional privilege."  *Id.*

¶ 32    But a prosecutor may comment on the defendant's demeanor while testifying, particularly because jurors receive an instruction that they may consider courtroom demeanor in assessing a witness's credibility.  *See United States v. Gooch*, 506 F.3d 1156, 1160-61 (9th Cir. 2007); *People v. Constant*, 645 P.2d 843, 846 (Colo. 1982) ("[A] prosecutor may draw reasonable inferences as to the demeanor and credibility of witnesses.  Based upon the facts of this case, the prosecution's argument is consistent with the instruction to the jury which permits the jury to consider the demeanor of witnesses for credibility purposes."); *cf. People v. Walters*, 148 P.3d 331, 336 (Colo. App. 2006) (stating that the prosecution may not argue that jurors should discuss among themselves whether, like the prosecutor, they saw the defendant laughing and smiling following the victim's trial testimony).

¶ 33    There is no meaningful distinction between the prosecution's commentary on a defendant's demeanor while testifying in the courtroom and commentary on a defendant's demeanor while answering questions during a video-recorded interrogation that the

14

jurors viewed during trial. A jury may consider the manner in which a defendant answered questions during an interrogation. *See Rothgeb v. United States*, 789 F.2d 647, 650-51 (8th Cir. 1986). In *Rothgeb*, a state trooper was allowed to tell the jury that the defendant had held his breath, "pant[ed] like a dog," and sweated profusely while answering questions about the killings of his wife and child. *Id.* at 650. "[E]vidence concerning a defendant's demeanor during the questioning is . . . admissible . . . ." *Id.* at 651; *see also People v. Vaughn*, No. 3-12-0996, 2015 WL 5451332, at *9 (Ill. App. Ct. Sept. 15, 2015) (unpublished opinion) (finding no prosecutorial misconduct when the prosecutor commented on the defendant's demeanor during recorded interviews shown to the jury because "[t]he jury was free to make whatever reasonable inferences it chose to make based upon the evidence").

> D. The Prosecutor's Closing Argument Properly Commented on Thames's Demeanor During the Interrogation

¶ 34    We conclude that the prosecutor did not comment on Thames's silence during the interview. Rather, the comments were a permissible reference to Thames's demeanor during the Interrogation. *See Rothgeb*, 789 F.2d at 650-51.

¶ 35    Thames did not sit quietly when questioned during the Interrogation. He answered the investigators' questions and repeatedly maintained his innocence, but without any display of emotion or anger. Using the same tone of voice, he said he did not know why investigators had found his DNA in J.T.'s apartment, denied ever having been in the apartment, denied ever meeting or seeing J.T., denied ever having sex with J.T., and said he was partying at another location at the time of the murder.

¶ 36    The prosecutor's argument thus rested on how Thames denied his involvement in J.T.'s sexual assault and murder, and not on Thames's silence in response to questions regarding his role in the crimes.

¶ 37    While the prosecutor did note that an innocent person "would be screaming to the heavens I'm innocent" if accused of murder, the prosecutor's argument focused on Thames's tone of voice and lack of "real emotion [or] anger" during the questioning. The words the prosecutor used — "screaming," "outrage," "defian[ce]," "indignation," "surprise," "indignity," "anger," "frustration," and "shock" — highlighted Thames's flat affect during the Interrogation. The prosecutor urged the jurors to recall Thames's "total lack of

reaction" and "cool" demeanor, and not his silence in responding to the officers' questions, in the video the jurors had seen.

¶ 38    In contrast, *Ortega* concerned a law enforcement officer's testimony regarding the defendant's questioning following his arrest for first degree trespass and felony theft of tools from a truck. *See Ortega*, 198 Colo. at 181, 597 P.2d at 1035. The defense argued that the defendant had merely intended to remove the items from the truck for safekeeping after the property owner had been involved in an accident.

¶ 39    The prosecutor argued in closing that the defendant had had an opportunity to explain, but had failed to say, during his interrogation that he had merely attempted to safeguard the property. *Id.* In rebuttal closing, the prosecutor rhetorically asked why the defendant's statement had not included a protestation of innocence. *See id.* at 181-82, 597 P.2d at 1035-36.

¶ 40    The supreme court held that these statements were an improper commentary on the defendant's exercise of his right to remain silent because they "expressly directed the jury to consider, as evidence of the defendant's guilt, his failure to protest his innocence or to offer an exculpatory statement." *Id.* at 183, 597

P.2d at 1037; *see United States v. Velarde-Gomez*, 269 F.3d 1023, 1030-33 (9th Cir. 2001) (holding that prosecutor's argument regarding the defendant's lack of response when confronted with evidence against him violated the defendant's privilege against self-incrimination and was not merely commentary on his demeanor); *People v. Welsh*, 58 P.3d 1065, 1071 (Colo. App. 2002) ("[T]he use of pre-arrest silence when the defendant does not testify impermissibly burdens the privilege guaranteed by the Fifth Amendment and thus is inadmissible in the prosecution's case-in-chief as substantive evidence of guilt or sanity."), *aff'd*, 80 P.3d 296 (Colo. 2003).

¶ 41    Unlike the impermissible arguments in *Ortega*, *Velarde-Gomez*, and *Welsh*, the prosecutor in this case did not comment on Thames's silence because Thames was not silent during the Interrogation. As the jurors saw for themselves when they watched the video, Thames responded to the investigators' questions and denied having sexually assaulted or killed J.T. The prosecutor focused on the manner in which Thames answered those questions. For this reason, we conclude that the prosecutor did not impermissibly comment on Thames's silence in violation of his right

against self-incrimination.  *See Gooch*, 506 F.3d at 1160-61;

*Constant*, 645 P.2d at 847.

IV.    The Trial Court Did Not Err by Permitting the Jury to View the
Video of the Interrogation

¶ 42     Thames next argues that the trial court erred in permitting the

jury to view the video of the Interrogation because it depicted him

wearing a prison uniform.  We do not agree.

A.     Standard of Review

¶ 43     A reviewing court may not reverse a trial court's decision to

admit or exclude evidence absent a showing that the trial court

abused its discretion.  *People v. Gibbens*, 905 P.2d 604, 607 (Colo.

1995); *People v. Dist. Court*, 869 P.2d 1281, 1285 (Colo. 1994).

When reviewing a trial court's admission of evidence in light of the

balancing test of CRE 403, an appellate court must assign to the

evidence the maximum probative value and the minimum unfair

prejudice that a reasonable fact finder might attribute thereto.

*Gibbens*, 905 P.2d at 607.  To overcome this presumption in favor of

the trial court's ruling, the defendant must demonstrate that the

decision was "manifestly arbitrary, unreasonable, or unfair."  *People*

*v. Ibarra*, 849 P.2d 33, 38 (Colo. 1993); *see also People v. Czemerynski*, 786 P.2d 1100, 1108 (Colo. 1990).

### B.     Law Governing the Presumption of Innocence

¶ 44     The Fourteenth Amendment to the United States Constitution guarantees defendants in state criminal cases the right to a fair trial.  *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  And the presumption of innocence is "a basic component of a fair trial under our system of criminal justice."  *Id.*

¶ 45     That presumption "is directly undermined when the defendant is required to appear before the jury in visible restraints or prison clothes."  *People v. Knight*, 167 P.3d 147, 153-54 (Colo. App. 2006).  "Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."  *Deck v. Missouri*, 544 U.S. 622, 629 (2005).

### C.     Showing the Jury the Video of the Interrogation Did Not Violate the Presumption of Innocence

¶ 46     Thames contends that publication of the video of the Interrogation invited the jury to speculate about his criminal history

because of his attire. (For purposes of this analysis, we assume the jury believed Thames was wearing a prison uniform during the Interrogation, although the People contest this factual issue. The video showed him wearing green scrubs.) Thames asserts that this possible speculation denied him the presumption of innocence afforded to criminal defendants. We disagree.

¶ 47 More importantly, Thames has not alerted us to, nor are we aware of, any Colorado case holding that a court violates the presumption of innocence by allowing the jury to view a video showing the defendant attired in prison garb. The presumption of innocence is undermined only "when the defendant is required to *appear before the jury* in visible restraints or prison clothes." *Knight*, 167 P.3d at 153 (emphasis added).

¶ 48 Allowing the jury to see a defendant in prison clothing during trial is problematic because

> the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that, not unlike placing a jury in the custody of deputy sheriffs who were also witnesses for the prosecution, an unacceptable

> risk is presented of impermissible factors coming into play.

*Williams*, 425 U.S. at 504-05. "[E]very defendant is entitled to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man, except as the necessary safety and decorum of the court may otherwise require." *Eaddy v. People*, 115 Colo. 488, 491-92, 174 P.2d 717, 718-19 (1946) (holding that a defendant cannot be compelled to wear prison clothing "throughout his trial").

¶ 49    The risk of prejudicing the defendant due to his clothing is not present when the jury is shown a video depicting the defendant in a prison uniform. *See Ritchie v. State*, 875 N.E.2d 706, 718 (Ind. 2007) (explaining that "[t]he concerns with having a criminal defendant appear in jail clothing or shackles in a courtroom proceeding are not directly applicable" to a video of the defendant's police interview). As another court pointed out:

> While it is easy to understand how viewing a defendant in handcuffs and jail clothing during trial might risk diluting the presumption of innocence, the same cannot be said about exposure to a video showing the defendant in jail clothing and handcuffs during an interview prior to trial. . . . [M]ost jurors would not be surprised by the fact that a defendant was

22

> handcuffed and wearing jail clothing while in
> jail prior to trial.

*Bramlett v. State*, 422 P.3d 788, 794 (Okla. Crim. App. 2018).

¶ 50    Unlike the visual impact of a defendant's attire throughout a trial, the clothing shown in a video lasting one hour and fourteen minutes will not be a "constant reminder" of the defendant's condition or create a prejudicial, continuing influence in jurors' minds. *Nelson v. Cain*, No. CIV. A. 13-4998, 2014 WL 2859147, at *18 (E.D. La. June 23, 2014); *see Thames*, ¶ 3, 344 P.3d at 893-94 (noting that Thames's interrogation lasted one hour and fourteen minutes).

¶ 51    Thames does not contend that the trial court required him to appear in the courtroom in visible restraints or prison clothes. Rather, in the video, he is not restrained, is not handcuffed, and is depicted seated in what appears to be a conference room with pictures on the wall. Under these circumstances, Thames was not deprived of his right to have the jury presume him innocent. *Knight*, 167 P.3d at 153.

¶ 52    To the extent Thames argues that our decision should be different because the prosecution modified the video of the

Interrogation to blur his prison identification badge and thereby improperly highlighted his incarceration, we are not persuaded. Even if the blurred badge drew the jurors' attention to Thames's prison clothing, the trial court did not require him to appear in the courtroom in a prison uniform. *Id.* Without this element, the presumption of innocence remained intact. *Id.*

¶ 53 Thus, we conclude that the trial court did not violate Thames's right to be presumed innocent when it allowed the jury to view the video of the Interrogation.

V. The Trial Court's Refusal to Admit Evidence of the Results Was Harmless

¶ 54 Thames next contends that the trial court violated his right to present a defense by refusing to admit the Results. We need not decide whether the court erred in this regard because we conclude that any error in the trial court's refusal to admit this evidence does not require reversal.

A. Testimony About the Results

¶ 55 The prosecution filed a pretrial motion pursuant to section 16-3-309(5), C.R.S. 2018, to require in-person testimony to lay the foundation for admission of any laboratory reports on which

24

Thames might rely at trial. Yvonne Woods, a Colorado Bureau of Investigation analyst, testified on cross-examination that she had examined the Results, which a company called GeneScreen had prepared years before, when she had conducted her own analysis of the DNA evidence. She testified that the Results indicated "there could be some blood from J.T." on Dewey's shirt. She said that she had performed her own DNA testing on different sections of the shirt.

¶ 56 Defense counsel then moved to admit the Results. The prosecutor objected, arguing that Woods had not conducted the tests that produced the Results, as required under section 16-3-309(5). The court ruled that, pursuant to the statute, the Results were inadmissible without the testimony of the analyst who had performed the underlying tests. Defense counsel filed a motion for a continuance to locate the analyst, which the trial court denied.

¶ 57 Defense counsel then attempted to admit the Results through the testimony of the detective who had arrested Dewey. The trial court again ruled the Results inadmissible under section 16-3-309(5).

## B. Standard of Review

¶ 58 We review a trial court's admission of testimony for an abuse of discretion. *Ibarra*, 849 P.2d at 38. A trial court abuses its discretion if its decision "was manifestly arbitrary, unreasonable, or unfair." *Id.*

¶ 59 An erroneous evidentiary ruling may constitute constitutional error if it deprives a defendant of, among other things, his right to present a defense. *People v. Beilke*, 232 P.3d 146, 149 (Colo. App. 2009). A defendant's right to present a defense, however, is violated "only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009). Thus, when an evidentiary limitation does not deprive a defendant of his sole means of testing the prosecution's evidence, reversal is required only if any error substantially influenced the verdict or affected the fairness of the trial. *Id.* at 1064.

## C. Law Governing the Admission of Laboratory Results

¶ 60 Evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve'" may violate a defendant's constitutional

rights.  *Holmes*, 547 U.S. at 324 (citation omitted).  However, the Constitution requires only that the accused be permitted to introduce all relevant and admissible evidence.  *People v. Harris*, 43 P.3d 221, 227 (Colo. 2002).

¶ 61     Colorado law limits the admissibility of laboratory results in certain circumstances.  To permit the admission of laboratory results, a party can require the in-person testimony of the individual who conducted the tests that produced the results. § 16-3-309(5).  (The statute expressly applies only to persons who testify "on behalf of the state."  *Id.*  But we decide this issue on grounds other than the trial court's erroneous application of the statute to a witness who testified on behalf of the defense.)

### D.    Any Error Was Harmless

¶ 62     Thames raises several arguments regarding the Results.  But we need only address his contention that, by refusing to admit the Results, the trial court deprived him of a meaningful opportunity to present a defense and to confront witnesses against him.  We conclude that any error was harmless.

¶ 63     The trial court's decision not to admit the Results did not substantially influence the verdict or affect the fairness of the

27

proceedings. The jury was shown several pieces of DNA evidence that linked Thames to the crime scene. Those test results placed Thames's DNA in locations where no other suspect's DNA was detected. Woods testified that Thames's DNA was found on a blanket in J.T.'s apartment, the pieces of soap inserted in J.T.'s vagina, and the leash used to strangle J.T., as well as underneath J.T.'s fingernails.

¶ 64 Even though Woods did not testify at length about the Results, she did say it was possible that J.T.'s blood was on Dewey's shirt. Further, the trial court did not prevent defense counsel from arguing in closing that J.T.'s blood was found on Dewey's shirt.

¶ 65 During closing argument, defense counsel referred to the Results several times. Defense counsel argued that "J.T.'s blood was on the shirt back in 1996" and that Woods had tested different areas of the shirt when she conducted her analysis years later. Counsel further argued that, even though "the type of testing they did back then wasn't as advanced . . . as it is now," no witness had challenged the accuracy of the Results. Defense counsel also asserted "[t]here is not a concern that GeneScreen got it wrong back in 1996. Not a legitimate one." Counsel concluded this argument

28

by stating, "So, J.T.'s blood was on the shirt in 1996. Just because they tested new areas of the shirt that didn't have her blood spatter on it, does not mean that GeneScreen was wrong in 1996. That is faulty logic."

¶ 66 Based on this record, we conclude that the trial court's decision not to admit the Results was harmless.

## VI. The Alleged Errors Do Not Amount to Cumulative Error

¶ 67 Thames further contends that, even if each of the above alleged errors does not separately require reversal, he was deprived of a fair trial because of the errors in the aggregate. We disagree.

¶ 68 To decide this issue, we must evaluate whether "[n]umerous formal irregularities . . . in the aggregate show the absence of a fair trial." *Howard-Walker v. People*, 2019 CO 69, ¶ 24, ___ P.3d ___, ___ (quoting *Oaks v. People*, 150 Colo. 64, 66-67, 371 P.2d 443, 446 (1962)). "A conviction will not be reversed if the cumulative effect of any errors did not substantially prejudice the defendant's right to a fair trial." *People v. Whitman*, 205 P.3d 371, 387 (Colo. App. 2007) (citing *People v. Roy*, 723 P.2d 1345, 1349 (Colo. 1986)). Individual rulings that adversely affect a party, if not determined to be erroneous, cannot serve as the basis for reversal under a

29

cumulative error analysis. *People v. Clark*, 214 P.3d 531, 543 (Colo. App. 2009), *aff'd on other grounds*, 232 P.3d 1287 (Colo. 2010).

¶ 69     As noted above, we have found no error in the trial court's decision to refuse to admit evidence of Dewey's conviction, the prosecutor's comments during closing argument, or the admission of the video of the Interrogation. We assume, without deciding, that the refusal to admit the Results was error. Even if it was erroneous, however, Thames still received a fair trial because "[t]he doctrine of cumulative error requires that *numerous* errors be committed . . . ." *People v. Rivers*, 727 P.2d 394, 401 (Colo. App. 1986) (emphasis added). Even assuming that the trial court erred once, a single error is insufficient to reverse under the cumulative error standard. *Id.* Accordingly, we conclude there is no basis for reversal on grounds of cumulative error.

### VII.   Although Imposition of the Surcharges Did Not Violate Thames's Double Jeopardy Rights, He Is Entitled to Argue He Should Not Be Required to Pay Them

¶ 70     Thames contests the Surcharges, which the trial court imposed after sentencing: (1) a sex offender surcharge; (2) a special advocate surcharge; (3) a genetic testing surcharge; and (4) court costs. He contends that the imposition of the Surcharges following

30

his initial sentencing violated his double jeopardy rights. He further contends that he was wrongfully deprived of the opportunity to seek a waiver of the Surcharges based on his indigency or inability to pay. While we disagree that the trial court violated Thames's double jeopardy rights, we remand to the trial court to allow Thames to request a waiver of the Surcharges.

### A. Standard of Review and Law Governing Double Jeopardy When a Court Corrects an Illegal Sentence

¶ 71 The alleged violation of a defendant's double jeopardy rights is a legal question we review de novo. *People v. Tillery*, 231 P.3d 36, 48 (Colo. App. 2009), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo. 2011). The Double Jeopardy Clauses of the United States and Colorado Constitutions protect a defendant from being twice punished for the same offense. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18. A court violates a defendant's double jeopardy rights by "increasing a lawful sentence after it has been imposed and the defendant has begun serving it" because the increased sentence may, in certain circumstances, constitute multiple punishments for the same offense. *People v. McQuarrie*, 66 P.3d 181, 182 (Colo. App. 2002).

¶ 72    An illegal sentence does not implicate double jeopardy, however. Such a sentence "may be corrected at any time by a sentencing court without violating a defendant's rights against double jeopardy." *People v. Smith*, 121 P.3d 243, 251 (Colo. App. 2005); *see also* Crim. P. 35(a) ("The court may correct a sentence that was not authorized by law or that was imposed without jurisdiction at any time . . . ."); *Bozza v. United States*, 330 U.S. 160, 166-67 (1947) (holding that a sentence may be increased without implicating double jeopardy when the original sentence did not conform to a statutory requirement). We review the legality of a sentence de novo. *People v. Bassford*, 2014 COA 15, ¶ 20, 343 P.3d 1003, 1006.

    B.    Imposition of the Surcharges to Correct an Illegal Sentence Does Not Violate Thames's Rights Against Double Jeopardy

¶ 73    All four of the Surcharges are mandatory. *See* § 13-32-105(1)(a)-(b), C.R.S. 2018 ("[T]here shall be charged against the defendant a total docket fee of thirty [five] dollars, which shall be payable upon conviction of the defendant."); § 18-21-103(1), C.R.S. 2018 ("[E]ach person who is convicted of a sex offense . . . shall be required to pay a surcharge . . . ."); § 24-4.2-104(1)(a)(II)(A),

C.R.S. 2018 ("[A] [special advocate] surcharge of one thousand three hundred dollars shall be levied on each criminal action resulting in a conviction . . . ."); § 24-33.5-415.6(3)(a), C.R.S. 2018 ("A cost of two dollars and fifty cents is hereby levied on each criminal action resulting in a conviction . . . for a felony . . . ."); *see also People v. Hyde*, 2017 CO 24, ¶ 28, 393 P.3d 962, 969 ("The legislature's use of the word 'shall' in a statute generally indicates its intent for the term to be mandatory.").

¶ 74     A court must therefore impose the Surcharges unless it finds the defendant is entitled to a waiver.

¶ 75     Initially, we note that the special advocate surcharge is akin to a civil sanction and is not punitive. *See McQuarrie*, 66 P.3d at 182-83 (referring to the surcharge imposed by this statute as the "victims and witnesses surcharge"). Because this surcharge is not punitive, it does not implicate double jeopardy protections. *Id.*

¶ 76     Thames's original sentence was contrary to statute, and therefore illegal, as the trial court did not include the Surcharges in the sentence. *People v. Yeadon*, 2018 COA 104, ¶ 51, ___ P.3d ___, ___ (*cert. granted* Mar. 25, 2019). Thames's double jeopardy rights were therefore not implicated through the imposition of the

Surcharges. *Smith,* 121 P.3d at 251 (correcting an illegal sentence does not violate a defendant's right against double jeopardy). For this reason, the trial court must amend the mittimus to address the Surcharges (either by imposing them or waiving them after considering Thames's arguments that he is not required to pay them) and thereby correct his illegal sentence. *Yeadon,* ¶ 51, ___ P.3d at ___.

C. The Trial Court Must Give Thames the Opportunity to Prove He Is Indigent or Otherwise Financially Unable to Pay the Surcharges

¶ 77 By statute, each of the Surcharges may be waived based on the defendant's financial status. *See* § 18-21-103(4) ("The court may waive all or any portion of the surcharge required by this section if the court finds that a person convicted of a sex offense is indigent or financially unable to pay . . . ."); § 24-4.2-104(1)(c) ("The [special advocate] surcharge levied by this section may not be suspended or waived by the court unless the court determines that the defendant is indigent."); § 24-33.5-415.6(9) ("The court may waive a cost or surcharge levied pursuant to [section 24-33.5-415.6] if the court determines the defendant is indigent."); *see also* Chief Justice Directive 85-31, Directive Concerning the Assessment and

Collection of Statutory Fines, Fees, Surcharges, and Costs in Criminal, Juvenile, Traffic and Misdemeanor Cases (amended Aug. 2011) ("If the statute or rule is silent as to the court's authority for waiver or suspension of the specific fine, fee, surcharge, or cost being considered, this [Chief Justice Directive] shall provide authority for the court to waive or suspend the imposition or collection of the amount only in those instances where the court finds the Defendant or Respondent has no ability to pay the assessed amount.").

¶ 78    Despite the statutory waiver language, the trial court imposed the Surcharges on Thames without giving him an opportunity to prove he falls within one or more of the exemptions.  Thus, we remand to the trial court to afford Thames an opportunity to prove he is entitled to a waiver.  *Yeadon*, ¶ 52, ___ P.3d at ___.

### VIII.  Conclusion

¶ 79    The judgment is affirmed.  The case is remanded to the trial court with instructions to provide Thames with the opportunity to prove he is entitled to a waiver of one or more of the Surcharges.

JUDGE ROMÁN and JUDGE J. JONES concur.